LANDRY, Judge.
These consolidated actions arise from a one car accident which occurred at night when a vehicle being driven by Gary O’Keefe failed to negotiate a curve in a rural two-lane highway. The vehicle left the roadway and crashed into a tree, killing O’Keefe and seriously injuring his guest passenger, Sonja Vervik, minor daughter of Mr. and Mrs. Racine T. Ver-vik.
The Department of Highways (Department) appeals from judgments awarding Mr. and Mrs. O’Keefe damages in the sum of $10,000.00 each for the death of their son, and also awarding Mr. O’Keefe special damages in the sum of $1,748.00, and granting Mr. Vervik the sum of $12,016.00, individually, and the further sum of $40,000.00 for and on behalf of his minor daughter. Mr. and Mrs. O’Keefe have answered the appeal praying for an increase in their awards for the death of their son. We reverse and reject the claims of all plaintiffs.
The principal issues on appeal are whether the curve was of such nature to require signing as a matter of law, and whether a curve sign which had been removed from the roadway had been missing sufficiently long to charge the Department with notice thereof. Appellant urges error on the part of the trial court in: (1) Holding the curve required a warning sign as a matter of law; (2) finding the sign had been removed sufficiently long before the accident to charge the Department with notice of its removal; (3) awarding excessive damages for personal injuries sustained by Miss Vervik, and (4) assessing the Department with costs other than stenographer’s fees for taking testimony contrary to LSA-R.S. 13:4521.
The accident occurred between 9:00 and 10:00 P.M., November 4, 1969, on Louisiana Highway 1085 (1085), locally known as Bootlegger Road. The road was dry and the weather clear. Highway 1085, formerly a gravel road, had been blacktopped before the accident for use as a detour while repairs were being made on nearby Highway 21. The curve in question was located almost directly in front of the home of a Mr. Mathies, not otherwise identified, whose son, Arthur B. Mathies, resided with his father. At the point of the curve, the road ran in an easterly-westerly direction. It is stipulated that a curve sign was in place west of the curve as a warning to eastbound motorists. It is also stipulated that a curve sign had been erected east of the curve to alert westbound motorists, but that the sign had been removed prior to the accident. The length of time the sign had been missing was a muchly disputed issue which is rendered moot by our finding that there was no duty on the part of the Department to sign this particular curve.
It is stipulated or established that when the accident occurred, the highway at the point of the curve was not marked with a center line. Neither was it marked with a solid yellow line indicating “no passing.” Also stipulated is the fact that prior to the accident, there were no curve delineators installed on the side of the roadway. After the accident, the missing curve sign was replaced, and curve delineators were erected. East of the curve in question is situated another curve which was signed. The nature of this latter curve is not fully explained in the record.
*533 Decedent O’Keefe was dating Miss Vervik who was then 17 years of age. C’Keefe had never before driven over Highway 1085. He had ridden over that road at least once in a vehicle being operated by an acquaintance, Tasso J. Taylor, also accompanied by Miss Vervik and Taylor’s then fiancee, Dorothy Signorina. Miss Vervik was familiar with the highway having driven or ridden over it numerous times to visit her friend, Miss Signorina, who lived nearby.
The sole available witness to the tragedy was Miss Vervik. She testified decedent had picked her up at the home of Miss Signorina at about 7:30 P.M. After she and decedent had driven around for a time, decedent was returning her to her home when the accident occurred. Decedent was driving westerly on 1085. She explained that, before reaching the curve in question, the car passed through another curve without incident. At this time, decedent was traveling about 45 miles per hour. Miss Vervik was bending over attempting to get a station on the car radio when she recalled that another curve lay ahead. She attempted to alert the driver about the approaching curve, but all she could say was “Gary” before the car ran off the highway. She was of the opinion that decedent was traveling about 55 miles per hour at the time of the accident.
It is the Department’s duty to adopt a manual specifying a uniform system of traffic control devices for use by both the state and local authorities where appropriate. LSA-R.S. 32:235. The Department has adopted such a manual, pertinent portions of which appear of record. At page 29 of the manual, it is stated: “The curve sign, showing a curve arrow shall be used to mark a curve where a test with a ball bank indicator gives readings of 10 degree or more at speeds between 30 and 60 miles per hour . . . .” (Emphasis by the Court.)
We are in complete accord with the rule announced in Harkins v. State Department of Highways, La.App., 247 So.2d 644, that the Department’s manual is merely persuasive, and that failure to comply with its requirements does not constitute negligence per se.
The alleged liability of the state in instances of this nature is determined in the light of the jurisprudence which imposes upon the state and local governments the duty of maintaining public highways under their jurisdiction in a reasonably safe condition for use by the public at all times. This duty includes the obligation of efficient and continuous inspection of highways and bridges. The agency charged with this obligation is not required to keep highways in perfect condition or maintain a perfect inspection procedure, nevertheless its officers and employees must use ordinary and reasonable care to insure that highways and bridges will be kept in reasonably safe condition. McCullin v. State of Louisiana, Department of Highways, La.App., 216 So.2d 832.
Included in the duty of keeping highways safe is the obligation of erecting and maintaining signs warning of dangerous conditions, especially where there is inherent danger, as in the case of obstructions or excavations in a highway or a highway terminates abruptly, or there are dangerous curves in the highway, or a bridge has been destroyed, and also where expressly required by statute. However, warning signs need not be maintained at locations which do not present an extraordinary or unusual hazard as, for example, at curves of an ordinary character or where there is no legal duty to post signs. 60 C.J.S. Motor Vehicles § 192, pp. 1001-1004.
The duty to post signs or warning-barriers does not arise unless an unusual and inherently dangerous condition exists in such proximity to a highway as to make travel thereon unsafe for persons using the roadway for the purpose for which it was constructed, and also exercising due care *534 for their own safety. Lejeune v. State Farm Automobile Insurance Company, La. App., 107 So.2d S09.
For a public body to be held liable for injuries caused by a defect in a public highway, plaintiff, as in all cases, must establish every element of his claim to a legal certainty by a preponderance of evidence. Pelloat v. State of Louisiana, Through Department of Highways, La. App., 198 So.2d 674.
In such instances, plaintiff must establish that the defect in question was potentially dangerous to persons exercising ordinary care and prudence, and that the public body concerned had either actual or constructive knowledge of the alleged defect. Dupre v. Louisiana Department of Highways, La.App., 154 So.2d 579.
In instances of this nature, plaintiff must prove causal connection between his damages and defendant’s alleged negligence. Pelloat, above.
Also pertinent herein is the well established rule that findings of fact by a trial court will not be disturbed on appeal unless shown to be manifestly erroneous. Crawford v. Abbott Automobile Co., Ltd., 157 La. 59, 101 So. 871.
In urging that the curve required erection and maintenance of a warning sign as a matter of law, plaintiffs point out that a sign was in fact installed when Highway 1085 was improved. Plaintiffs further note that while installation of warning devices installed after the accident does not necessarily indicate negligence, it can be presumed therefrom that the sign originally installed was erected pursuant to a ball bank test conducted by the Department which showed a sign was necessary. This assumption is completely refuted by the record. We also find no merit in plaintiffs’ contention that the mere erection of the sign by the Department, and its reinstallation following the accident, indicates the Department considered the curve dangerous.
Arthur B. Mathies, Retired Army Officer, testifying for plaintiffs, stated that at the time of the accident, he was living in his father’s home situated near the accident scene. He stated the road appeared to curve around the house which sat directly on the inside of the curve. Although he recalled three prior accidents in this same curve, he discussed only two, of which only one he recalled in detail. He did not witness any of the prior accidents, and conceded they all involved vehicles proceeding in an easterly direction opposite to that in which decedent was traveling. On one occasion, he was first to reach a vehicle which overturned and struck a tree. On one other occasion, he arrived in time to witness a tow car hauling a vehicle away. In describing the curve, he stated that when vehicles reached it “. . . instead of staying on the road, they would run off the curve on the shoulder.” He explained that because of large holes dug by automobiles on the side of the highway where the blacktop had been chewed out, one could hear cars when they rounded the curve and hit the hole, making a repeated “thump, thump, thump.” He stated that the curve was a “small curve” explaining “ . . . you are in and out before you know you are in a curve . . . you just go shoop and you are out of it.”
Mrs. Elma C. Landry, who lived across the highway from the Mathies home, was familiar with the curve. She explained her difficulty in negotiating the curve as follows: “Well, it was like this, the road looked straight and before you knew it there was a curve. The difficulty was straightening up. There had been several wrecks prior to this one.” She gave no details regarding other prior accidents.
Mr. Allen J. Perkins testified he had driven over the road four or five weeks prior to the occurrence of subject accident. He described his experience in negotiating the curve in question as follows: “Well, I *535 was driving I would say at the legal speed between fifty-five and sixty and when I went into that curve I suddenly was on the left hand side and I didn’t see the curve and before I knew it I had drifted over to the left.” Mr. Perkins conceded he kept his vehicle under control, and further explained that his experience occurred at 3 :00 o’clock in the afternoon.
Mr. Tasso J. Taylor, friend and coworker of decedent, O’Keefe, testified he was quite familiar with the road having driven it many times. An experienced driver, he had negotiated the curve many times, in both automobiles and trucks, and explained that he could “Take it sixty, seventy miles an hour without any trouble. Speed is no problem in a curve.” He further opined he could take this particular curve at 80 miles per hour, or perhaps faster, but noted that he drove a sports car which permitted him to do things which could not be done in an ordinary vehicle.
Miss Vervik, who was well acquainted with the road in question, testified in effect that the curve was “tricky.” She explained that by that term, she meant a driver came into the curve before realizing a curve was there.
Mr. Judson O’Keefe, father of decedent, who was familiar with road construction, went to the scene of the accident within two or three days thereafter. His assessment of the nature of the curve is best stated in his own words as follows: “Actually, let me make something clear. If they want to go out there and get technical about it, it is not a curve. It comes up this way and it goes off in front of the house. It’s not a gradual curve .... It makes a point right in front of that house. I have set many a curve in my life time building roads but I have never seen one set in like this one.” He further explained that, in his view, the curve would not be so bad if it were elevated but that it was flat and without elevation. He referred to the curve as “. . . a flat curve, a flat elbow I’d call it . . . .”
Mr. Herbie Jones, employed by the Department as Traffic Sign Superintendent covering five parishes, including St. Tammany Parish in which subject accident occurred, testified that he personally signed Highway 1085 in August, 1968. He checked the road with an odometer (a distance measuring device) on his vehicle, and erected signs at all the curves. His testimony is clearly to the effect that he did not use a ball bank indicator, but merely employed his own judgment in determining whether or not a particular curve required a sign. He acknowledged that since the accident in question, he had negotiated the curve in question at a speed in excess of the legal limit. When asked his opinion as to whether or not the manual required a sign at the curve in question, he replied affirmatively, and explained that a sign at this curve would be for the benefit of people unfamiliar with the road, especially at night.
Mr. Lacy Glascock, expert Traffic Engineer employed by the Department, explained the method and details of a ball bank indicator test, and his interpretation of the results thereof in the light of manual requirements. According to Glascock, the test is used to determine the maximum safe speed at which a vehicle can traverse a curve under the most inclimate highway conditions, that is, with the highway surface being wet. He interpreted the pertinent manual provision to mean that if the indicator gave a reading of ten degrees at speeds from 31 to 59 miles per hour, inclusive, a sign should be posted at the curve tested. He explained that the instrument is read in general terms since it is graduated only five degrees difference, and is used “. . . more or less as a guide and it has a certain amount of error built into it just as a matter of safety the error is included in the estimate itself or a measure of error.” He concluded a sign was not required if a reading of ten degrees was not attained until a speed of 60 miles per hour was reached. He noted that the instrument *536 takes into account the superelevation of the road surface, side friction on the vehicle and the centrifugal force on the passengers. He was of the view that the test is not a definite mathematical test which determines with absolute certainty whether a sign is needed or not. Rather, he concluded, the necessity for a sign rests in large measure upon the discretion of the person conducting the test.
Following the accident Glascock, accompanied by other Department employees, conducted a ball bank indicator test on the curve in question. In so doing, he used a 1970 Chevrolet Sedan, a standard Department vehicle. With the instrument properly installed, the vehicle was driven around subject curve at least twice in each direction, once at 55 and once at 60 miles per hour. Glascock noted that in each instance, the indicator did not reach a ten degree reading at any speed below sixty miles per hour, but did reach a ten degree reading at exactly 60. His personal inspection of the curve disclosed that it apparently had adequate superelevation at least on the inside, but he was not abso-. lutely certain it was the same on the outside. He did not measure the degree of the curve, but, in his professional judgment, he estimated it to be about 5 degrees. In view of the results of his test, Glascock considered the curve to be borderline as respects the necessity for a sign. In his opinion, the manual would leave the matter to the judgment of the individual making the test. Although conceding a sign was not required, Glascock stated that out of an abundance of precaution, hp would have recommended signing the curve. Neither would he recommend removing the sign which had been replaced following the accident. He explained that he considered the degree so close to requiring a sign, according to the manual, that he would leave the sign up. When queried whether the curve could be considered troublesome based on his tests, he replied that the issue was whether the curve was dangerous and that, while anything can be dangerous, he “didn’t see anything unusual about the curve.” Glascock also noted that it is unwise to put curve signs where they are not needed because the public soon learns that curves can be negotiated at faster than posted speeds and tends to disregard signs. He noted that the Department’s present policy is to set curve signs in accord with the result of ball bank indicator tests. He conceded that some signs are posted without making such tests, and also admitted that it is not uncommon to install signs at locations following an accident although one is not required. In such instances, an employee concludes that a sign might prevent another accident at the same location regardless of what caused the prior accident. It is clear from Glascock’s testimony that, based on his personal observation and tests, he did not consider the curve dangerous, but deemed it ordinary and saw nothing unusual about it.
Our review of photographs of the curve offered in evidence indicates nothing dangerous or unusual about the curve in question. The curve is revealed as a short rather than sweeping arc which appears to be approximately 5 degrees as testified by Glascock.
The testimony of plaintiffs’ lay witnesses does not establish by a preponderance of credible evidence that the curve was dangerous or that it presented such an unusual and unexpected hazard to motorists, even one unfamiliar with and traveling upon the highway at night, as to require a sign to alert drivers as to its presence ahead. Mr. Mathies’ testimony concerning the occurrence of other accidents is of little probative value considering he was not familiar with the details thereof, and also considering these accidents involved vehicles proceeding in the opposite direction with the benefit of a curve sign. Since these motorists passed a warning sign, we can only presume that these accidents did not result from their running off the road due to the absence of a sign. As regards Mathies’ testimony concerning cars *537 running off the road in the curve, we do not interpret it to mean that ruts were being formed on the shoulder of the highway by cars running off the road as contended by plaintiffs. Rather, we understand Mathies’ testimony to be that vehicles had worn away a portion of the blacktop along the edge of the improved surface resulting in a hole.
Neither does the testimony of Herbie Jones establish that a sign was required as a matter of law. Jones did not make a ball bank indicator test. He stated simply that he traveled over the road and put up signs at'his discretion. There is nothing in the record to substantiate Jones’ statement that a sign was required by the manual.
We reject plaintiffs’ contention that the manual should be construed to require a sign where a ball bank test indicates 10 degrees at a speed up to and including sixty miles per hour. The manual states at speeds “between 30 and 60 miles per hour”, a sign is required. We think it clearly means, as interpreted by Glascock, speeds from 31 to 59 miles per hour only. Moreover, assuming the manual is properly interpreted as plaintiffs suggest, mere failure to conform to its standards does not constitute negligence per se. Pelloat, above. Failure to conform to manual standards must, as a matter of law, constitute negligence on the Department’s part.
We conclude the testimony of plaintiffs’ witness, Taylor, and the Department’s expert, Glascock, clearly preponderates in favor of the conclusion that the curve was not dangerous as a matter of law and therefore required no sign. Taylor clearly indicated he had personally negotiated it many times at speeds in excess of the legal limit. The only expert to testify, Glascock, testified unequivocally the curve was not dangerous, but was ordinary in nature. We note that Glascock’s testimony was that the curve was safe at maximum legal speed of 60 even when the highway was wet. Decedent failed to traverse it going only 55 miles per hour on a dry roadway. Under the circumstances, we find that the most probable cause of the accident was decedent’s failure to maintain a proper lookout and keep his vehicle under control.
We find that the trial court erred in concluding that the Department was obligated to sign the curve in question. We also find there was no such duty in view of the evidence concerning this particular curve. We further find that in the absence of a duty to sign, the Department’s failure to sign cannot be deemed a proximate cause of the accident herein sued upon.
The judgments of the trial court in these consolidated actions in favor of plaintiffs are hereby annulled, reversed and set 'aside, and judgment rendered in favor of the Department, rejecting plaintiffs’ demands and dismissing plaintiffs’ actions in both suits. Costs of the single transcript herein are to be paid by all plaintiffs, in equal proportion; all other costs attributable to each action to be paid by plaintiffs in each suit in equal proportion.
Reversed and rendered.