302 So.2d 895 (1974)
Racine T. VERVIK, Individually and on behalf of his minor daughter Sonja Vervik, as Administrator of her Estate
v.
The STATE of Louisiana, DEPARTMENT OF HIGHWAYS.
Dezzie O'KEEFE, wife of/and Judson O'Keefe
v.
The STATE of Louisiana, DEPARTMENT OF HIGHWAYS.
No. 53756.
Supreme Court of Louisiana.
March 25, 1974.
On Rehearing October 28, 1974.
Rehearing Denied November 27, 1974.
Harold J. Lamy, New Orleans, William M. King, Covington, Dodd, Hirsch, Barker, Meunier, Boudreaux & Lamy, Windhorst, Heisler, DeLaup & Wysocki, Jerome M. Volk, Jr., Fritz H. Windhorst, New Orleans, for plaintiffs-applicants.
Philip K. Jones, Gen. Counsel, Norman L. Sisson, Robert J. Jones, Doran & Kivett, *896 by William J. Doran, Jr., Sp. Asst. to Gen. Counsel, La. Dept. of Highways, Baton Rouge, for defendants-respondents.
SUMMERS, Justice.
These are consolidated tort suits in which plaintiffs seek damages against the Department of Highways for failing to mark and sign a highway curve.
The suits were instituted by Racine T. Vervik, for himself, individually, to recover medical expense; and on behalf of his minor daughter, Sonja, for her personal injuries, pain and suffering. Dezzie and Judson O'Keefe, the mother and father of Gary O'Keefe the deceased, seek damages for his wrongful death. Judgment for the plaintiffs in the trial court was reversed on appeal to the First Circuit. 278 So.2d 530. We granted certiorari to review this decision. 281 So.2d 751.
The accident occurred on the night of November 14, 1969 between 9:00 and 10:00 o'clock. At the time Gary O'Keefe was twenty years old and Sonja was seventeen. He had been in the merchant marine. She was a premed student at Southeastern.
On the day of the accident, Gary had gone to the Gulf Coast early in the morning to work with a cleanup crew repairing the ravages of Hurricane Camille. About six o'clock that night he and Donald McLain, a friend, returned to Covington and stopped at a tavern where Gary could call a girl, presumably Sonja. At the tavern they had a coke. At 6:30 Gary was home. After his father helped him put a battery in his 1959 Chevrolet Impala, he went over to Dorothy Signorina's house where Sonja was visiting. His friend Tasso Taylor who was Dorothy Signorina's then fiance was there also. They were all good friends.
About 7 or 8 o'clock Gary left the house with Sonja to take her home. She had called her parents to tell them she was on her way. In order to reach her home, Gary had to detour on Bootlegger Road (La. Highway No. 1085). He had only been on this road once before as a passenger in Taylor's car when he and Sonja were in the back seat. They were proceeding in a westerly direction. The road was dry and normal weather conditions prevailed.
Shortly before the accident Gary rounded a curve in the road to the east of the accident site, driving 45 miles per hour. Upon entering the straightaway he accelerated to 55 miles per hour. When he arrived at the curve in question, he failed to negotiate it, and ran through the curve into the ditch on the opposite side of the road where his vehicle collided with a tree. As a result Gary was instantly killed, Sonja was badly injured and the automobile was demolished.
When the accident occurred the curve in the highway was not marked with a center line, or a solid yellow line at the approach to the curve indicating "no passing". No curve delineators (small reflectors placed on poles at intervals on the shoulder of the road along the outer edge of the curve to delineate its limits) were installed. No curve sign marked the approach to the curve, although one was previously installed but had been missing for several weeks prior to the accident. A curve sign and the curve delineators were installed after the accident.
The only surviving witness to the accident was Sonja. She testified that Gary was driving and she was "fooling with the radio" when the accident happened. She was aware, however, that they were approaching the curve. Realizing that he was accelerating the vehicle's speed, she attempted to warn him. Just as she called out "Gary", the auto ran straight ahead, through the curve and off the highway at 55 miles per hour.
There was no evidence that Gary attempted to negotiate the curve, or that he applied his brakes. He ran through the curve at full speed. After striking a tree *897 the car came to rest 100 yards from the curve's beginning.
The site in question is approximately a five degree curve. At that point the highway is level and the road was in good condition. There were no features in the vicinage or peculiarities in the roadway which created any unusual hazards or a trap of any kind. Our examination of a number of photographs of the scene confirms this conclusion.
According to Lacy Glascock, engineer employed by the Department of Highways, a very candid and objective witness, there was nothing unusual or dangerous about the curve. He testified at length concerning the accepted standards established by the Louisiana Department of Highways and by other like agencies throughout the nation. These uniform standards provide that warning signs should be placed at highway curves when the "ball bank test" resulted in a reading of ten degrees at speeds under sixty miles per hour. Tests which he conducted made the curve in question a border line case at sixty miles per hour. He concluded that based upon the manual of accepted standards a sign at this curve would not be required. If he had the decision to make, however, he would place a sign at the curve in an abundance of caution.
Gary's friend Tasso Taylor testified that he had taken this curve in trucks and cars. He had driven his sports car at seventy to seventy-five miles per hour around this curve. Nothing about the curve was unusual or hazardous according to Taylor.
Although several persons living in the vicinity of the curve testified the sign had been missing for several weeks before the accident, none of them reported the fact to the Department or complained to others. Nor does the record establish that the Department or its employees received notice of the absence of the sign. The sign maintenance supervisor for the Department could not believe that the sign had been down for three to five weeks. One of the highway crews would have observed the absence of the sign and reported it to him, he said. Moreover, there was no evidence of any similar accidents during the period when the sign was missing.
The rules applicable to this factual situation, which have often been approved by the courts of Louisiana, are stated as follows:
The Department of Highways is not an insurer of the safety of drivers upon the roads and highways of the State. However, reasonable care requires, and the Department does owe, a duty to the traveling public to erect barricades, signs and adequate markings to warn against extremely dangerous, trap-like hazards, unusual obstructions, perilous conditions or defects in the road.
Especially is this duty imposed where the situation is inherently dangerous, as where there are obstructions or excavations in the way, or the highway terminates abruptly, or there are dangerous curves in the highway, or a bridge has been destroyed; and also where specifically required by statute. See La.R.S. 32:235.
There are no hard and fast rules established in law governing the particular type warning to be given in the various factual situations arising in these cases. It is understood, however, that the warning should be so designed in size and character as to adequately warn and alert the traveling public to the danger ahead. Whether the warning is required, reasonable, or adequate is determined by the place where the danger exists, the nature of the road and the general situation and circumstances surrounding it. All of these factors, together with the kind and speed of vehicles, are to be taken into consideration to determine whether the Department has discharged its duty. Edwards v. State, Department of Highways, 271 So.2d 672 (La.App. 1973), cert, denied, La., 274 So.2d 391; Harkins v. State, Dept. of Highways, 247 So.2d 644 (La.App.1971), cert, denied, 259 *898 La. 741, 252 So.2d 449; Christ v. State, Department of Highways, 161 So.2d 322 (La.App.1964), cert, denied, 246 La. 82, 163 So.2d 358; Lejeune v. State Farm Mutual Auto Ins. Co., 107 So.2d 509 (La.App. 1959); Smith v. State, Dept. of Hwys., 87 So.2d 380 (La.App. 1956); Dowden v. State, Department of Highways, 81 So.2d 48 (La.App.1955); Reeves v. State, Department of Highways, 80 So.2d 206 (La. App.1955), cert, denied, 228 La. 653, 83 So.2d 889; Blashfield, Automobile Law and Practice, ¶ 164.1, 164.4; 60 C.J.S. Motor Vehicles ¶ 192.
A careful review of the record affords no basis for rejecting the conclusion of the Court of Appeal that the plaintiffs' witness Taylor, and the Department's expert Glascock, established by a preponderance of the evidence that the curve was not dangerous as a matter of law. On this finding a sign was not required, and the absence of a sign was not a legal cause of the accident and damage resulting therefrom. We join with the Court of Appeal in concluding that the most probable cause of the accident was decedent's failure to maintain a proper lookout and his failure to keep his vehicle under control.
For the reasons assigned, the judgment of the Court of Appeal is affirmed.
BARHAM and CALOGERO, JJ., dissent.
TATE, J., dissents and assigns reasons.
TATE, Justice (dissenting).
I respectfully dissent.
The primary issue is whether the Department of Highways was negligent in failing to "sign" this curve, as a warning to drivers approaching it.
As the trial court found, the great preponderance of the evidence proved that the curve presented an unreasonable risk of injury to reasonably prudent motorists using the highway, unless it was properly signed to warn them.
The highway department, in fact, had placed a sign on the curve before the accident, ever since the road was opened as a black-top a year earlier. The sign had fallen down and was not replaced during three or four weeks before the accident, a fact of which the department has constructive notice under our jurisprudence. Prior to the present accident, there were at least three other accident on this curve during the year the highway was opened, resulting from a vehicle running off the highway and failing to make the curve, as in the present case. The sign was in fact replaced after the accident.
The accident occurred as the driver, proceeding at a speed of about fifty-five miles per hour (within the legal limits), was unable to make the curve, because his wheels pulled off onto the shoulder and he lost control of his car.
In the face of this strong evidence, the intermediate court and our present majority holds that the curve was not so unreasonably dangerous as to require a sign. The basis of this holding is the theoretical testimony of an engineer employed by the defendant department. The tests he made, as the majority stated "made the curve in question a borderline case at sixty miles per hour", so that "a sign at this curve would not be required. If he had the decision to make, however, he would place a sign at the curve in an abundance of caution."
The evidence shows that the curve was unreasonably dangerous to oncoming motorists, expecially at night. Due to the wooding and shrubbery on the side, an oncoming motorist approaching at a reasonable speed on the straight stretch of rural highway could not reasonably observe the sharp curve ahead until he was in it. At the same time, the nature of the banking at the curve increased the likelihood that a driver could not negotiate the curve unless he had slackened his speed before he entered it. The official highway tests, as I *899 read the engineer's testimony, in fact indicated a ten degree reading that required a sign to be posted.
In the face of the strong testimony to the contrary, I am completely unable to agree with the acceptance by appellate reviewers of theoretical testimony by an employee of the defendant department. That testimony itself indicates that, most favorably to the department, this was a borderline situation insofar as being unreasonably dangerous to an oncoming motorist unless signed. That theoretical tests might barely indicate a sign not to be "required" does not outweigh the strong proof, accepted by the trial court and supported by virtually all the other evidence, that in actual fact the curve was unreasonably dangerous and should have been signed to alert oncoming motorists to slow.
I therefore respectfully dissent.

ON REHEARING
BARHAM, Justice.
These are consolidated tort suits in which plaintiffs seek damages against the Department of Highways for an accident which allegedly resulted from the department's failure to mark and sign a highway curve.
The suits were instituted by Racine T. Vervik, for himself individually to recover medical expense, and on behalf of his minor daughter Sonja for her personal injuries, pain and suffering. Dezzie and Judson O'Keefe, the mother and father of the deceased Gary O'Keefe, seek damages for his wrongful death. Judgment for the plaintiffs in the trial court was reversed on appeal to the First Circuit. 278 So.2d 530 (La.App. 1973). We granted certiorari to review this decision. 281 So.2d 751 (La. 1973).
The accident occurred on the night of November 14, 1969, between nine and ten o'clock. At the time Gary O'Keefe was twenty years old and Sonja Vervik was seventeen. About six o'clock in the evening on the date of the accident Gary and a friend returned to Covington from the Gulf Coast and stopped at a tavern where they had a Coca-Cola. About seven or eight o'clock Gary left a friend's house with Sonja to take her home. In order to reach her home, Gary had to detour on Bootlegger Road (La. Highway No. 1085). He had only been on this road once before as a passenger in someone else's car when he and Sonja were in the back seat. On the night of the accident they were proceeding in a westerly direction. The road was dry and normal weather conditions prevailed.
Shortly before the accident Gary rounded a curve in the road to the east of the accident site, driving forty-five miles per hour. Upon entering the straightaway he accelerated to fifty-five miles per hour. When he arrived at the curve in question, he ran through the curve into the ditch on the opposite side of the road where his vehicle collided with a tree. Gary was instantly killed, Sonja was badly injured, and the automobile was demolished.
When the accident occurred the curve in the highway was not marked with a center line, nor with a solid yellow line at the approach to the curve to indicate "no passing". No curve delineators (small reflectors placed on poles at intervals on the shoulder of the road along the outer edge of the curve to delineate its limits) had been installed. No curve sign marked the approach to the curve; one was previously installed but had been missing for several weeks prior to the accident. A curve sign and the curve delineators were installed after the accident.
The only surviving witness to the accident was Sonja Vervik, one of the plaintiffs in these consolidated suits, the sole occupant other than the driver of the vehicle involved in the accident. She testified that Gary O'Keefe was driving and she was occupied with the radio dial, attempting to tune in a radio station. She became aware that they were approaching the curve which she remembered to be unmarked and that the driver, Gary, was accelerating the vehicle's speed. She started to warn him of *900 the unsigned and unmarked curve, but was only able to call out his name before the auto left the highway. She remembered that he did not apply the brakes at any time but only attempted to control the car by the manipulation of the steering wheel.
All of the evidence supports the conclusion that the automobile left the highway on the shoulder of the opposite lane of traffic in a direct line with the straightaway of the highway just travelled. As stated by one witness, Gary "straightened out the curve". From the point where the automobile departed from the highway, which was slightly beyond the beginning of the curve, the car travelled down a ditch eighty yards until it collided with a tree on the extreme left bank of the ditch.
The Court of Appeal and this Court in our original opinion, relied heavily upon the testimony of an engineer, Lacy Glascock, who testified for the Department of Highways. In fact, the principal basis of the holding of the majority on first hearing, is the following testimony:
"A. * * * From Covington the inside lane which formed the shorter radius of the curve was the one that appeared to have the super elevation on it, the higher roadway which is the outside lane of the curve I couldn't tell for sure. I'm sure it probably had some.
"Q. From the studies of this curve, what would you say is the angle of this curve?
"A. Well, I'm not sure that I can look at a curve and give you a pretty close estimate on the angle. I've not done this sort of thing very much before, but if I had to guess I would say in the range of five degrees, something of that nature.
"Q. A right angle is how many degrees?
"A. Ninety degrees.
"Q. This ball bank indicator test that you made indicated or read ten degrees on the ball bank indicator when your car was driven at sixty miles per hour around this curve?
"A. That's right.
"Q. When your car was driven at fifty five miles per hour around this curve, what did it read?
"A. It was something less than ten."
Glascock, in speaking of the "ball-bank test", and testifying that a reading of ten degrees was obtained at a speed of sixty miles per hour, was relating a rather practical method for obtaining a reading of the centrifugal force exerted upon a car because of a combination of speed, curve and bank. For example, high speed and a sharp angle in the curve, combined with a low degree of banking, result in a high reading on the testing device. The device used is similar to a carpenter's level and contains a ball-bearing which gravitates to the center of the device when the device is placed on the dashboard of a car travelling a perfectly level stretch of road at high speed. The ball-bearing in the device moves away from the center as the automobile tilts in response to the centrifugal force exerted when the driver attempts to make a curve. The court of appeal and the majority on first hearing determined that a reading of ten degrees on the "ball-bank test" must exist at a speed of less than sixty miles per hour before a dangerous curve is required to be signed.
Actually, the uniform highway standards promulgated in the Department of Highways manual, pursuant to the legislative direction of La.R.S. 32:235 requires signing if, at a speed of sixty miles per hour, a ten degree reading is obtained.[1] This is the obvious interpretation of the regulation since the speed limit at the time of its *901 adoption was sixty miles per hour for this class of highway unless otherwise limited by special regulation. If we were to determine that a violation of a regulation is negligence, per se, we could find negligence on that basis in the case at hand. However, this Court has rejected the assigning of civil negligence, per se, upon violation of penal and regulatory statutes. Moreover, the result of the test by Glascock is not determinative of the legal question presented to us under the special facts of this case. The risk encountered was not a result of the driver's inability to drive the vehicle upon the highway around this curve at 55 to 69 miles per hour. Gary did not fail to "make" the curve; he simply did not observe the curve and its nature timely.
Important to the determination of this case is the total nature of the road at the site of the accident. Perhaps most important is the "angle of this curve", and the observability of the nature of the curve. The degree of curvature or the actual angle of this curve is not to be confused with the ten degree reading obtained in the ball-bank test. The angle or degree of curvature of a curve is arrived at mathematically without consideration of the banking of the road bed. The expert witness relied upon by the court of appeal and this Court on first hearing stated that in his best judgment the curve was in the range of 5 degrees. The witness did not testify as to what is meant by a "five degree curve." However, the concept can be explained as follows:

2. D × R = 5,729.578. Therefore, given the degree of curve at 5 degrees, we can find the radius. The formula is R, = 5,729.578/5. R = 1,145.92.
What the formula says is that whatever the sharpness of the curve the angle (D) is subtended by the arc of 100 feet, and therefore the degree of curvature (D°) is to 360 degrees as 100 feet is to the circumference of a circle of the same radius.
Perhaps the disagreement about whether a dangerous situation exists in this curve results from a misunderstanding of the actual degree of curvature of this particular curve. In our opinion, this is no slight curve. Pictures of curves are very difficult to interpret. The court of appeal found this curve to be "ordinary in nature", stating that their review of the photographs indicated nothing dangerous or unusual about the curve. They further estimated that the curve was no more than a five degree curve. Yet it is obvious that they did not understand the engineering terminology for a degree of curvature of a curve. A five degree curve is a very unusual and dangerous curve, which we confirm after a review of the photographs of this curve. The curve is sudden and it is sharp. Because of the closeness of the growth of trees to *902 the road and the nature of the ditches a reasonably observant driver may find himself upon the curve, especially at night, before he is able to react to the change in direction in the highway. This interpretation of the photographs is confirmed by the testimony that the curve was "in the range of five degrees" and by the fact that such a curve is considered exceedingly dangerous by the Louisiana Department of Highways standards.
The Louisiana Department of Highways minimum design standards for rural highways and roads, adopted July 1, 1969 and revised several times, lists the controlling curvature for various systems of highways and roads. For a Class 1 and a Class 2 highway, the desirable degree of curvature is 3 degrees, and the maximum is 4 degrees. These two classes of highways are six-lane and four-lane highways. For a Class 3 highway or road, such as the one we consider, the desirable degree of curvature in building a highway is three degrees, and the maximum degree of curvature permitted is 5 degrees, 30 minutes (or 5 and ½ degrees). This means that on a two-lane highway in Louisiana the Louisiana Department of Highways will not permit the road to be constructed with a greater degree of curvature than five and one-half degrees. This requirement does not set the standard for signing curves. It does not set the standard for warning motorists of curves. It states simply that no road shall be built with a greater degree of curvature than five and one-half degrees. All two-lane highways should ideally have no greater degree of curvature than three degrees.
The highway department had "signed" this curve prior to the accident, obviously because it considered the curve to be one requiring notice to the operators of motor vehicles. We conclude from the testimony that the sign which had been placed to warn of the imminence of the curve had apparently been moved approximately one month before the accident and was in the actual custody of the highway department. We therefore conclude that the highway department knew, or should have known, of the sign's removal. Since the accident the department has signed the curve; it has marked the curve with a line of white paint in the center of the highway; and it has also marked it with curve delineators so that motorists may quickly observe the nature of the curve of the highway at night.
We conclude from the lay testimony and the expert testimony that the Louisiana Department of Highways owed a duty to those operating vehicles upon this road to warn them of the dangerous and unusual curve ahead. We find that the Department breached its duty to these plaintiffs when the sign was removed with its actual knowledge or at least with constructive knowledge which we impute to it under the circumstances. The absence of the sign was the legal cause of the accident and the damage resulting from the accident. We find this to be the only cause of the accident and reject a contributory negligence plea.
We have reviewed the record and we find no error in the assignment of damages by the trial court. Civil Code Article 1934(3). We therefore reverse the judgment of the Court of Appeal and reinstate the judgment of the trial court, affirming the awards of $10,000.00 each to Mr. and Mrs. Judson O'Keefe for the death of their son, and special damages to Mr. O'Keefe in the amount of $1,748.00, and awarding to Mr. Racine T. Vervik the sum of $12,016.00, individually, and the further sum of $40,000.00 for the benefit of his minor daughter. Awards to bear legal interest from date of judicial demand. Costs are cast against defendants as provided by law.
Reversed and rendered.
SANDERS, C. J., and SUMMERS and MARCUS, JJ., dissent, adhering to the views expressed by the court on original hearing.
NOTES
[1] The Highway Department's Traffic Control Devices manual contains the following:

"The curve sign, showing a curved arrow, * * *, shall be used to mark a curve where a test with a ball-bank indicator gives readings of 10 degrees or more at speeds between 30 and 60 miles per hour. * * *"