386 So.2d 1351 (1980)
Laura Jean STEWART, as Natural Tutrix of Clerice Yvett Wilson
v.
Don SCHMIEDER, d/b/a Schmieder Enterprises et al.
Dorothy Franklin JEFFERSON
v.
Don SCHMIEDER, d/b/a Schmieder Enterprises et al.
Roland DESHOTEL
v.
12055 AIRLINE CORPORATION et al.
Billie Jean McGOWAN, Individually and as Natural Tutrix of her Minor Child, Cheryl Sue McGowan
v.
Don SCHMIEDER, d/b/a Schmieder Enterprises et al.
Stanley L. STEVENS
v.
12055 AIRLINE CORPORATION et al.
No. 66437.
Supreme Court of Louisiana.
June 23, 1980.
Rehearing Denied September 12, 1980.[*]
*1352 Walter G. Monsour, Jr., Parish Atty., Frank J. Gremillion, Asst. Parish Atty., for City of Baton Rouge and Parish of East Baton Rouge, applicant.
John Dale Powers, David M. Vaughn, Sanders, Downing, Kean & Cazedessus, Baton Rouge, for Stanley L. Stevens, respondent.
Gordon M. White, Steve M. Marks, Baton Rouge, for Dorothy Franklin Jefferson, plaintiff-respondent.
*1353 William J. Doran, Jr., Doran & Kivett, Baton Rouge, for Richard Schmieder, defendant-respondent.
Thomas K. Kirkpatrick, Gary Keyser, Kirkpatrick, Keyser & Kirkpatrick, Baton Rouge, for Billie Jean McGowan and Cheryl Sue McGowan, respondents.
Harris D. Copenhaver, Jr., Airhart & Copenhaver, David W. Robinson, Watson, Blanche, Wilson & Posner, Charles William Roberts, Mengis, Roberts, Durant & Carpenter, Paul H. Due, Due, Dodson & deGravelles, Baton Rouge, John A. Bivins, Mouton, Roy, Carmouche, Hailey, Bivins & McNamara, Lafayette, Ben W. Lightfoot, Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, for respondents.
DIXON, Chief Justice.[*]
These five consolidated suits were brought against the City of Baton Rouge and the Parish of East Baton Rouge following the collapse, during the final stages of construction, of a building owned and being constructed by Don H. Schmieder. Three workmen, Jimmy Lee Wilson, Franklin Jefferson and William H. McGowan, were killed by the collapse, and two others, Roland Deshotel and Stanley Stevens, were injured. The trial court found that the City-Parish, Roy Rackley (the architect employed by Schmieder) and the prospective tenant of the building were liable.[1] The Court of Appeal reversed against the tenant, Rust Engineering Company, but affirmed the judgment against the City-Parish and the architect, Roy Rackley. Writs were granted on the application of the City-Parish.
The facts are as follows. Schmieder agreed to construct and then to lease a building located on his property to Rust Engineering Company. He retained Rackley to draw the plans and specifications for the building. The Baton Rouge Building Code required that plans and specifications drawn by a licensed architect or civil engineer accompany any application for a building permit for the type of building proposed. Five sheets of plans were prepared when Rackley was instructed to cease work and to apply for a permit from the City-Parish, using those plans completed. At that time the plans were incomplete and inadequate for purposes of construction. Rackley submitted the plans on November 28, 1973, and certified that they complied with the code, that he would inspect the construction and that on completion he would certify that the building had been completed in accordance with the plans and specifications.
Initially, the City-Parish refused to issue a permit, and indicated that more complete plans would be required. A permit was nevertheless issued on January 25, 1974, marked "shell only." The plans and specifications were never completed.
During construction, Rackley visited the building site, even though he was never called upon by Schmieder to make inspections. On the site he noted that there were a number of deviations from the incomplete plans he had submitted, and that electrical work was being done despite the fact that such work was not permitted under the shell permit that had been issued. He therefore on two occasions wrote to Schmieder pointing out the problems and suggesting that they be remedied. Copies of the letters were sent to and received by the City-Parish. Rackley also consulted with Vincent E. First, the manager of the *1354 Baton Rouge office of Rust Engineering Company, who had become concerned with the structural safety of the building. First communicated those concerns to the City-Parish. As a result, representatives of the City-Parish building official indicated by letter to Rackley that a certificate of occupancy would not be issued until the problems pointed to in Rackley's last letter to Schmieder were corrected.
On September 25, 1974 Rackley made an inspection and by hand delivered letter indicated to the City-Parish that his recommendations had been followed and the problems were solved. At that time, however, he had not been able to verify that that was actually the case. Five days later, on September 30, 1974, the building collapsed. The consensus of the experts who testified at trial was that the collapse was the result of a shear failure in the concrete roof at the point where the roof was connected to the north wall. The failure was the result of faulty design which allowed insufficient support for the roof and failed to take into account the shrinkage which occurred when the concrete roof cured.
The duties and powers of the City-Parish building official (the head of the construction permit and inspection department) are set out by ordinance in the Baton Rouge Building Code. Section 5(b) provides:
"The building official shall have the power and duty to enforce all of the provisions of this title; shall have general supervisory authority over the administration and enforcement of all building codes and ordinances; and shall coordinate the administration and enforcement of all such ordinances to insure that all provisions thereof are fully complied with before the issuance of necessary certificates of occupancy; all permits shall be issued by him and he shall collect all fees provided herein, and transmit the same to the director of finance. He shall examine premises for which permits have been issued, and shall make necessary inspections to see that the provisions of law are complied with and that construction is prosecuted safely. He shall, when requested by proper authority, or when the public interest requires, make investigations in connection with matters referred to in the building code, and render written reports on the same. He shall issue such notices and orders as may be necessary to enforce compliance with the provisions of the building code, to remove illegal or unsafe conditions, to secure the necessary safeguards during construction, and to require adequate exit facilities in buildings and structures."
Section 102.6 provides:
"Application for permits shall be accompanied by drawings of the proposed work, drawn to scale, showing foundation plans, floor and roof plans, elevations, sections and structural details sufficient to define completely the proposed construction. All plans shall be accompanied by duplicate plot plans, elevations, sections and structural details sufficient to define completely the proposed construction. All plans shall be accompanied by duplicate plot plans on letter-size sheets showing all lot dimensions and the location of the structure upon the lot or property with reference to each lot line. For all buildings or structures except as otherwise provided by this section, the application for a building permit shall be accompanied by a complete set of plans and specifications prepared by an architect or civil engineer licensed in accordance with Louisiana law, or under his supervision, and a certificate signed by the licensed architect or civil engineer to the effect that the said plans and specifications comply with and are in conformity with the requirements of this Code, the state fire code and the state sanitary code and that said plans and specifications were prepared by him or under his supervision; and, all applications shall also be accompanied by a load and stress sheet showing the weights carried by the supports, including columns, posts, girders, lintels, pillars, foundations and footings, when *1355 the building is fully loaded, and the safe loads such supports, etc., will carry and stress sheet showing the stresses caused by the required wind load and the manner in which they are transmitted into the ground. The application for a permit for any new building or structure shall be accompanied by a complete description of the kind and size of such buildings, the character of materials to be used, the ground area to be covered, and the net cubic contents of such building. Before a certificate of occupancy is issued, the architect or civil engineer must furnish the building official a certificate certifying that the building or structure has been completed, to the best of his knowledge, in accordance with the plans and specifications as approved by the inspection division and the maximum live load each floor will safely carry.
..."
As to the issuance of permits, Section 102.9 provides:
"The building official shall examine applications for permits, within a reasonable time after filing. If, after examination, he finds no objections to the same and it appears that the proposed work will be in compliance with the laws and ordinances applicable thereto and the proposed construction or work will be safe, he shall approve such application and issue a permit for the proposed work as soon as practicable. If his examination reveals ... that some objection exists, he shall reject such application and note his findings in a written report to be attached to the application and deliver a copy to the applicant. . . ."
In this case a permit marked "shell only" was issued. Such a partial permit is authorized by Section 102.11, which provides:
"Nothing in this code shall be construed to prevent the building official from issuing a permit for the construction of part of a building or structure before the entire plans and detailed statements of said building or structure have been submitted or approved, provided adequate information and detailed statements have been submitted for the same and have been found to comply with this code."
It can be seen that, in addition to general enforcement duties, the building official has the specific duty, before issuing a building permit, to require detailed plans and specifications to be submitted by a licensed architect or engineer. He further has the duty to examine those plans to determine that they comply with the laws and ordinances in effect and that the proposed construction is safe. In light of the City-Parish building official's failure to carry out that duty in regard to the structural plans and specifications for this building, and in particular in regard to the defectively designed wall connection which caused the collapse, we conclude that the City-Parish is liable to those injured and killed when the building proved to be structurally unsound.
The testimony of the expert witnesses at trial was that the roof-to-wall connection which failed was improperly designed. The City-Parish's own expert witness, Dr. Dean McKee, testified that the average competent engineer in the Baton Rouge area would have detected the weakness in the design, and that the design was in violation of building code requirements. The weakness could have been detected by a review of the drawings of the plans without checking the sophisticated mathematical calculations involved in determining the ultimate safety of a building design. Dr. McKee stated that he felt that if the plans had been reviewed by a structural engineer for the city, the engineer would have disapproved of the plans. The testimony of the other experts at trial is consistent with the conclusion that the design of the wall-to-roof connection was unsafe, and that that unsafe condition was discoverable by a competent engineer.
Leon Rodriguez, an employee of the City-Parish permit department, testified *1356 that he reviewed the plans when they were submitted for a permit. He testified that although the plans appeared to be structurally sufficient, he was in fact not qualified by experience or education to make such a judgment. In fact the substance of his testimony, and that of other City-Parish employees, was that neither he nor any other employee of the City-Parish actually examined the plans and specifications to determine if they were structurally sound.[2] In the area of the structural design of the building the City-Parish simply failed to make the examination required by the code. That failure led to the issuance of a permit to construct a building that was unsafe, and therefore to the eventual collapse of that building. It was the testimony of the City-Parish's employees who testified that the building official's office did not make it a practice to review submitted plans for structural soundness. Instead, the City-Parish relied on representations of the architect or engineer who designed the buildings as proof of safety. The witnesses pointed to Section 102.6 which provides that the architect or engineer must certify that the plans and specifications are in conformance with the code. However, the requirement for the certificate was not meant to relieve the City-Parish of its duty to examine applications to determine if the plans are safe.
First, the code specifically requires that detailed plans accompany an application. The code then provides that those applications be examined to determine if the construction is safe. There is no indication that the City-Parish is not obligated to examine the structural details of the plans submitted as well as the other portions of those plans.
Second, the code provision requiring the architect's or engineer's certificate does not contain language indicating that the certificate relieves the City-Parish of its duty to determine independently that the plans are structurally sound. In fact, the architect or engineer must certify that the plans and specifications are in compliance not only with those portions of the code dealing with the structure of the building but with the entire code, and the state fire and sanitary codes as well. It is not evident that the code provision was intended to render the office of the building official free from the duty to insure compliance with the code. Instead, the provision creates a second line of safety and security, in addition to the building official's duties of inspection, by providing that the architect or engineer, as well as the building official, is responsible for compliance with the code.
The City-Parish argues, however, that even if its employees breached a duty imposed by ordinance, it is not liable to these plaintiffsthat its duties in the issuance of permits and the inspection of construction are owed to the public generally and not to any particular member of the public. In support of this "public duty doctrine," the City-Parish cites Dufrene v. Guarino, 343 So.2d 1097 (La.App.1977), writ denied 343 So.2d 1068 (La.1977). In that case the court held that governmental officials charged with a duty of inspecting buildings for fire hazards were not liable for damages incurred in a fire on premises where no inspection had been made, or where inspection had been made improperly, and fire hazards were allowed to exist. The court reasoned that the duty to inspect was imposed to protect the public generally, and that no duty was owed individually to the persons who may have been on the premises in the future.[3]
The almost universally cited authority for the "public duty doctrine" is Cooley on *1357 Torts, 4th Ed., § 300 at page 385. Cooley states:
"The rule of official responsibility, then, appears to be this: That if the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it, or to perform it properly, is an individual wrong, and may support an individual action for damages. `The failure of a public officer to perform a public duty can constitute an individual wrong only when some person can show that in the public duty was involved also a duty to himself as an individual, and that he has suffered a special and peculiar injury by reason of its nonperformance.'"
The "public duty doctrine" has come under considerable attack in recent years. It has been called "in reality, a form of sovereign immunity." Adams v. State of Alaska, 555 P.2d 235, 241 (Alaska 1971). One court has said that it sets up just the type of "proprietary" and "governmental" distinction that was disposed of by the abolition of sovereign immunity. Coffey v. City of Milwaukee, 247 N.W.2d 132 (Wis.1976). It has also been criticized because it places the costs of inadequate performance on the shoulders of the innocent victims of official neglect, rather than spreading the costs of such neglect throughout society. 39 Albany L.Rev. 599, 601 (1975). The doctrine is also said to be predicated largely upon the erroneous assumption that, without it, a municipality would be subjected to crippling judgments because of the negligence of its employees, a fear which also hampered the abrogation of sovereign immunity. 13 Colum.J.L. and Social Problems 303 (1977). The doctrine also has the effect of removing a great deal of the incentive for public bodies to see that the functions of government are carried out responsibly and with reasonable care. The need for governmental responsibility in the modern world was a major factor in this court's action in abandoning the doctrine of sovereign immunity in Board of Commissioners of the Port of New Orleans v. Splendour Shipping & Enterprises Co., 273 So.2d 19 (La.1973). It is noteworthy that in a number of states where the doctrine is applied it has been seriously eroded in recent years. See, e. g., Oleszczuk v. State of Arizona, 124 Ariz. 373, 604 P.2d 637 (1979); Sanchez v. Village of Liberty, 49 A.D.2d 507, 375 N.Y.S.2d 901 (1975).
This court has not before now had occasion to consider the applicability of the "public duty doctrine" in Louisiana. We have, however, in many instances, held governmental entities or public officials liable for the breach of duties which, at first blush, appear to be owed to the public rather than any individual. For example, the maintenance of highways and streets by the state and local governments is an undertaking that benefits the general public and is not carried out for any particular individual. Nevertheless, we have not hesitated to find the state or local entities liable for failure to maintain the streets and highways in a reasonably safe condition. United States Fidelity & Guaranty Co. v. State of Louisiana, Through the Dept. of Highways, 339 So.2d 780 (La.1976); Pickens v. St. Tammany Parish Police Jury, 323 So.2d 430 (La.1975); Vervik v. State of Louisiana, Dept. of Highways, 302 So.2d 895 (La.1974). *1358 Similarly, the incarceration of criminals would appear to be a duty owed to the public in general, but when the custodian's negligence in allowing an escape causes injury to an individual, the custodian may be held liable. Frank v. Pitre, 353 So.2d 1293 (La.1978). Furthermore, in Eschete v. City of New Orleans, 258 La. 134, 245 So.2d 383 (1971), we held that a city might be held liable for the wrongful performance of a duty in many respects similar to that of the issuance of building permits. In that case we held that the plaintiff's allegation that the city had authorized the creation of new subdivisions, with the knowledge that such authorization would cause flooding, thereby increasing the plaintiff's peril of flooding, stated a cause of action.
Therefore, under the jurisprudence of this state, the mere fact that a duty is of a public nature, and benefits the general public, does not require a conclusion that the city cannot be found liable for the breach of that duty.
In addition, we note that in jurisdictions where the "public duty doctrine" is applied, it is subject to the important exception that liability can be founded upon the violation of a duty that would be generally considered to be owed to the public, if the statute or ordinance setting forth the duty indicates, by its language, that the duty is designed to protect a particular class of individuals. In Halvorson v. Dahl, 89 Wash.2d 673, 574 P.2d 1190 (1978), it was held that an ordinance identifying "conditions and circumstances ... dangerous and a menace to the health, safety, morals or welfare of the occupants of such buildings and the general public" was found to be designed to protect a specific class of individuals (building occupants) as well as the general public. 574 P.2d 1190 at 1193-1194. In Oleszczuk v. State of Arizona, supra, the court held that the duties of the driver licensing authority to maintain a record of an applicant's previous accidents and cancellations, to establish a medical examining board, and to require answers to certain questions on an application were duties designed specifically to protect that portion of the public using the state highways. The court in that case held that the state could be held liable for the issuance of a driving permit to an individual suffering from a psychomotor disorder who injured the plaintiffs by driving while disabled by his disease. See, also, State v. Superior Court of Maricopa County, 123 Ariz. 324, 599 P.2d 777 (1979).
In the instant case the building official had the power and the duty to inspect premises for which a permit had been issued to insure that "the provisions of law are complied with and that construction is prosecuted safely." Further, he was empowered and obligated to issue such notices and orders necessary to enforce codal compliance, to remove unsafe and illegal conditions, and to "secure the necessary safeguards during construction." It is plain from that language that the building official, in addition to his general enforcement duties, was charged with a special duty to see that the construction of buildings was carried out safelya special duty in favor of those injured by accidents occurring during construction, such as the workmen who were injured in this case. Therefore, it is irrelevant whether the "public duty doctrine" would exculpate the building official from liability for breach of those broader duties which may more properly be considered to be owed to the public in general.
We conclude that a finding of liability on the part of the City-Parish is not precluded by the jurisprudence of this state or the "public duty doctrine." The City-Parish must be held responsible for having breached its duty to examine plans for proposed construction projects, and thereby causing injury to the plaintiffs.
For the reasons assigned, the judgment of the Court of Appeal is affirmed, at relator's cost.
MARCUS, J., dissents.
NOTES
[*] Marcus and Lemmon, JJ., would both grant a rehearing.
[*] Chief Judge Frederick Stephen Ellis, Louisiana Court of Appeal, First Circuit, Justice Ad Hoc, recused.
[1] These suits were brought against Don H. Schmieder, Richard D. Schmieder, John W. McLaughlin, 12055 Airline Corporation, Roy Rackley, the City-Parish, Rust Engineering Company and American Mutual Liability Insurance Company, Rust Engineering's insurer. Don H. Schmieder, McLaughlin and 12055 Airline Corporation settled with all plaintiffs and the suits were dismissed against them. All suits were dismissed against Richard D. Schmieder after trial on the merits.
[2] Some calculations on structural safety were received by the City-Parish and approved by James G. Atteberry, a civil engineer in the employ of the City-Parish Department of Public Works. Atteberry was not qualified as a structural engineer to review those calculations. In any event the calculations submitted and approved were incomplete and did not apply to the roof-to-wall connection that failed.
[3] The application of the "public duty doctrine" in the area of fire inspection has been criticized. See 13 Colum.J.L. and Social Problems 303 (1977). As noted by Cooley, the duties of public inspectors are owed to the individuals who could be affected as well as to the public at large. He also notes that a building inspector can be liable for negligence. Cooley on Torts, 4th Ed., § 304 at page 403. This court has held that the negligent inspection of pork creates a cause of action against an official inspector. Tardos v. Bozant, 1 La.Ann. 199 (1846). In addition, it has been said that an insurer can be liable for the negligent inspection of a premises, which would indicate that the Dufrene decision failed to actually treat the city inspectors in the same way in which private inspectors would be. Rogers v. Highlands Insurance Co., 270 So.2d 277 (La.App.1972).