395 So.2d 916 (1981)
Elizabeth BUSH et al., Plaintiffs-Appellants,
v.
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS, Defendant-Appellee.
Cora MOCK et al., Plaintiffs-Appellants,
v.
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS, Defendant-Appellee.
Claude DRODDY et ux., Plaintiffs-Appellants,
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT et al., Defendants-Appellees.
Nos. 14455 to 14457.
Court of Appeal of Louisiana, Second Circuit.
February 16, 1981.
Writs Refused April 27, 1981.
*917 Broussard, Bolton & Halcomb by Daniel E. Broussard, Jr., Alexandria, for plaintiffs-appellants, No. 14455.
Craven & Scott by John W. Scott, Alexandria, for plaintiffs-appellants, No. 14456.
D. G. Brunson, Jonesboro, for plaintiffs-appellants, No. 14457.
Philip K. Jones, Marshall W. Wroten, Robert J. Jones and Doran & Kivett by William J. Doran, Jr., Baton Rouge, for defendants-appellees.
Before PRICE, HALL and MARVIN, JJ.
PRICE, Judge.
These are consolidated tort suits in which the primary issue presented on appeal by appellants is whether the defendant-appellee, Department of Transportation and Development, Office of Highways of the State of Louisiana, was guilty of fault which was a legal cause of the automobile accident resulting in the deaths of David Bush and Lloyd Mock and injuries to Mrs. Dolline Droddy. Secondary issues include the negligence of David Bush and the amount of damages awarded to Mrs. Droddy.
*918 The accident occurred on U. S. Highway 167 in Winn Parish, Louisiana, approximately 3.4 miles north of Dodson on March 24, 1976, at approximately 12:45 p. m. A steady rain had fallen all day and it was raining at the time of the accident with some water accumulation on the road surface. Mrs. Droddy was driving north in the direction of her home in Wyatt on a return trip from Winnfield. Approaching Mrs. Droddy in the southbound lane was a 1972 Buick being driven by David Bush. The Bush vehicle suddenly spun to its left across the center line, striking the car driven by Mrs. Droddy. This collision resulted in the deaths of Bush and Mock, a passenger in the Bush vehicle, as well as the severe injuries sustained by Mrs. Droddy.
Mrs. Droddy, joined by her husband, brought suit against the estate of David Bush (who was uninsured) and the State of Louisiana through the Department of Transportation and Development, Office of Highways. (An original defendant, State Farm Mutual Automobile Insurance Company, was dismissed from the action.) The petition charged the highway department with negligence in failing to adequately maintain and repair the site in question which resulted in the formation of depressions and ruts in the highway which filled with water during a rain. The Droddys contend that these failures to maintain and repair resulted in a dangerous and defective condition which caused the injuries of which they complain. The Droddys' petition alternatively alleged that their damages were caused by the combined negligence of the highway department and David Bush. The alleged negligence of Bush consisted of failing to maintain control, crossing the center line, operating his car in an unsafe manner under the circumstances, and failing to see what he should have seen or drive as he should have driven.
The highway department answered the petition denying any negligence and claiming that the accident was caused solely by the negligence of Bush and Mrs. Droddy. The department filed a third party petition against the estate of Bush for contribution in the event it was cast for damages.
In a separate action Elizabeth Bush (widow of David Bush), appearing individually and as natural tutrix of seven minor children of the marriage between herself and decedent, joining with three other children of the marriage, brought suit against the highway department for the wrongful death of Bush allegedly caused by the negligence of the department. The department denied any negligence and alternatively contended that Bush was guilty of contributory negligence which was a bar to recovery.
In a third suit arising from this accident, Cora Mock (widow of the guest passenger in the Bush vehicle, Lloyd Mock) brought suit against the department in her own behalf and on behalf of one of her minor children seeking damages for the wrongful death of Lloyd Mock. Joining as parties-plaintiff in this suit were seven other children of the decedent, Lloyd Mock.
The department answered the Mock suit by denying liability and filing a third party demand against the Bush estate.
These three suits were consolidated for purposes of trial. After trial, the district court held that the sole cause of the accident was the negligence of Bush in operating his vehicle at a speed greater than was reasonable and prudent under the conditions existing at the time. Accordingly, judgment was rendered in favor of the highway department and against plaintiffs in all three cases rejecting their demands at plaintiffs' costs. Judgment was rendered in favor of Mrs. Droddy and against the Bush estate in the amount of $75,000 as compensation for her pain and injuries and in favor of Mr. Droddy in the sum of $6,849.50 in medical expenses and property damage.
From this judgment appeals were perfected by Mr. and Mrs. Droddy, the Bush estate, and the Mock heirs. The central issue on appeal is the alleged fault and liability of the highway department. Appellants specify that the district court erred in failing to find that (1) a dangerous situation existed at the scene of the accident as a result of the condition of the highway; (2) *919 this dangerous situation was a legal cause of the accident; (3) the highway department was negligent in failing to correct or warn motorists of the dangerous condition; or (4) the department is strictly liable for damages caused by the defective road which presented an unreasonable risk of injury to motorists.
U.S. Highway 167 had been resurfaced from Jonesboro south to the Jackson Parish line, and from Winnfield north to a point approximately two miles south of Dodson. The accident occurred on a section of the highway lying between the resurfaced areas which had not been resurfaced since 1960.
Rain had been falling all day and each lane of the highway near the scene of the accident contained depressions or ruts in which water had accumulated. Mrs. Droddy testified that she knew that the highway collected water in these ruts when it rained, and that a driver had to slow down and pay close attention. She stated that rain was still falling at the time of the accident. Mrs. Droddy testified she was going approximately 30 to 40 miles per hour immediately prior to the collision. Although she was knocked unconscious, she remembers seeing the Bush vehicle sliding sideways in its lane. Mrs. Droddy was watching her rearview mirror as she slowed down when the collision occurred.
Donnie Bonnette was traveling north behind Mrs. Droddy when the collision occurred. He testified that he had come to a stop in order to turn left as he watched the Bush vehicle "come over a little rise like deal and it looked like they just ... the car took off and flew in front of the lady and collided." Bonnette testified that he knew the Bush vehicle had hit the ruts filled with water because he could see water spray up on the windshield when they hit it. "It looked like all four wheels come off the ground and it just went over in the lady's lane. There wasn't nothing she could do but hit it."
Bonnette testified that he also was aware that the road held rainwater in the ruts when it rained, and that it was raining at the time of the accident. He stated that the ruts were clearly visible on the road surface and the highway contained these water-filled ruts all the way back to the Jackson Parish line. Bonnette testified that he was aware of several prior unreported accidents in which cars had left the road because of the water in the ruts. He testified that Mrs. Droddy was driving approximately 35 to 40 miles per hour, and that Bush appeared to be driving too fast under the conditions because he "lost control."
In an attempt to establish the speed of the Bush vehicle, both sides introduced experts in the fields of accident reconstruction and hydroplaning. Both Herman Warkentin and Dr. Don Ivey agreed that the most important variables utilized in determining the speed at which a car would hydroplane were tire pressure, tire tread depth, depth of water on the road, and texture depth of the pavement. However, the methods used by these experts to determine these variables and the application of them in arriving at the speed of the Bush vehicle at the moment it hydroplaned differed markedly.
Mr. Warkentin assigned a figure of .018 inch for the texture depth of the pavement based on the type of pavement at the accident scene as derived from a publication, whereas Dr. Ivey actually made silicone putty measurements of the pavement along the road surface north of the crash site and at the spot where the cars came to rest following the collision. Dr. Ivey's measurements revealed that the texture depth at the accident scene varied from .065 to .079 inches, or more than three times the texture depth figure used by Mr. Warkentin in arriving at the hydroplaning speed. This is significant because Dr. Ivey testified that the higher the texture depth, the faster a car has to be moving before it will hydroplane. Dr. Ivey utilized the lowest measured figure or .065 inches in his computation.
Both Mr. Warkentin and Dr. Ivey arrived at their figures for tire pressure and tire tread depth from published results of accident studies. However, Mr. Warkentin utilized *920 27 PSI as being the average tire pressure cited in the studies, whereas Dr. Ivey utilized 30 PSI as the most frequently observed tire pressure. Again, Mr. Warkentin used the average tire tread depth cited in the accident studies and Dr. Ivey used the most frequently observed.
Both experts utilized a cross sectional survey of the highway prepared by Richard Smith, civil engineer, in arriving at a figure for water depth. The survey showed that the depressions in the lane occupied by the Bush vehicle were as deep as .455 inches. Both Warkentin and Ivey made allowances for the fact that the depressions were slanted and tended to drain and traffic was continually splashing water out of the ruts. Warkentin assigned a depth of .25 inches and Ivey 1/8 inch to their respective computations of hydroplane speed. Warkentin calculated a minimum hydroplane speed of 48 miles per hour for the Bush vehicle. It was his opinion, however, that Bush was traveling between 45 and 50 miles per hour when his car began to hydroplane. Ivey's opinion was that the minimum speed Bush would have been traveling in order to hydroplane at the accident scene was 59 miles per hour.
Both experts again differed in their approaches at determining the speed of the two cars at impact. Mr. Warkentin first approximated the amount of energy expended in the deformation of the two vehicles by utilizing a method which was originated to determine closing speed of vehicles and not energy absorption. Dr. Ivey testified that the method used by Mr. Warkentin to determine energy absorption of the vehicles may have been "... the only way to go 20 years ago, but it is completely subjective and really based ... is based on the talent of the individual to imagine something happening. And the variation in that sort of a scheme is just incredible." Dr. Ivey arrived at his figures for the energy expended during the collision by the application of coefficients derived from many vehicle tests which in his opinion "represented the latest technique in determining energy losses during collisions."
Tuley Wells, highway maintenance superintendent for Winn Parish at the time of the accident, testified that the ruts or depressions in the highway were caused by the heavy trucks which used this particular stretch of road. Wells stated that his crews covered all roads in the parish and were aware of the depressions in this particular area of Highway 167. If the depressions became deep enough to warrant repair, Wells testified that his crews would place a "skin patch" over the rut. Wells stated that unless the depressions were approximately ½ inches deep, it was impractical to apply a patch because the patch itself would not adhere to the road surface unless it was ¾-1 inch thick. Applying a patch to a depression less than ½ inches deep resulted in a patch creating a high spot in the road. As Wells stated, "I mean, sometimes you are in worse shape after you finish up than you was before you started, but you try."
The following legal principles govern our resolution of this case:
... The law is settled that the Department of Highways is not responsible for every accident which may occur on the state highways, nor is it a guarantor of the safety of travelers thereon, or an insurer against all injury which may result from obstructions or defects in such highways.... Generally, it is the duty of the Highway Department to construct and maintain the highways in a condition reasonably safe for persons exercising ordinary care and reasonable prudence.... (citations omitted)

United States Fidelity and Guaranty Co. v. State, Department of Highways, 339 So.2d 780 (La.1976).
... However, reasonable care requires, and the Department does owe, a duty to the traveling public to erect barricades, signs and adequate markings to warn against extremely dangerous, trap-like hazards, unusual obstructions, perilous conditions or defects in the road.... Whether the warning is required, reasonable, or adequate is determined by the place where the danger exists, the nature of the road and the general situation and *921 circumstances surrounding it. All of these factors, together with the kind and speed of vehicles, are to be taken into consideration to determine whether the Department has discharged its duty.... (citations omitted)

Vervik v. State, Department of Highways, 302 So.2d 895 (La.1974).
There is no fixed rule for determining what is a dangerous defect in a public way; the facts and surrounding circumstances of each particular case control. The test usually applied, however, requires an answer to the question: Was the public way maintained in a reasonably safe condition for persons exercising ordinary care and prudence? ... (citations omitted)
Pickens v. St. Tammany Parish Police Jury, 323 So.2d 430 (La.1975).
The plaintiffs' evidence falls short of establishing the existence of a dangerous defect in Highway 167 at the scene of the accident. Rain collecting in depressions on an old highway is not an unusual situation. There is no evidence of any particular unusual defect or depression in the highway at the scene of the accident other than the same type of ruts and depressions found on this particular stretch from the Jackson Parish line north of the accident scene to an area some distance south of the site. Bush had already traveled a considerable distance south of the Jackson Parish line over the highway containing these ruts and must be deemed to have noticed that which was plainly visible to other motorists.
The trial judge accepted the opinion of Dr. Ivey that Bush was traveling at least 59 miles per hour at the moment he lost control as his car began to hydroplane. Although the two expert witnesses differed in their opinion as to the speed of the Bush vehicle, the trial judge accepted that of Ivey as being entitled to greater weight because of his training, experience, studies, and research. The record adequately supports this evaluation of the expert testimony by the trial judge. The trial judge receives expert testimony and assigns the weight to it he feels it deserves based on such factors as the qualification and experience of the witness. See e. g. Gleason v. City of Shreveport, 393 So.2d 827 (La. App.2d Cir.1981).
the most likely inference to be drawn from the evidence is that the accident resulted from Bush's failure to maintain control due to his driving too fast under the conditions prevailing at the scene of the accident and not from any defect or dangerous condition of the highway. Although the road surface was not perfect, it was capable of being negotiated during a heavy rain by persons prudently taking the necessary precautions. The testimony relating to prior accidents along the highway does not lend credence to the theory that the roadbed was defective because the location and cause of these accidents was not clearly established.
We conclude that the plaintiffs have failed to establish the existence of a dangerous condition or defect at the scene of the accident, or that any condition found in the road surface was a cause in fact of the accident. Consequently, there was no warning sign required and the absence of such warnings cannot be a legal cause of the accident. Cf. Petree v. Crowe, 272 So.2d 399 (La.App.2d Cir.1973), writ refused 274 So.2d 709 (La.1973). Accordingly, we affirm the trial court's holding absolving the department of highways of liability based on negligence.
The appellants contend that the department should be held liable even if no breach of duty is established. This contention is based on La.C.C.Art. 2317 which imposes liability without a showing of negligence on those who have a thing in their custody which causes damage to another.
Having concluded that the roadbed was not dangerous to motorists exercising ordinary care and prudence, it follows that there was not a defect presenting an unreasonable risk of injury to those motorists. Therefore, we hold that La.C.C.Art. 2317 is not a basis for imposing liability on the highway department in this case.
*922 The Bush and Mock appellants contend that the trial court erred in finding that David Bush was negligent in the operation of his vehicle.
La.R.S. 32:64 provides:
A. No person shall drive a vehicle on the highway within this state at a speed greater than is reasonable and prudent under the conditions and potential hazards then existing, having due regard for the traffic on, and the surface and width of, the highway, and the condition of the weather, and in no event at a speed in excess of the maximum speeds established by this Chapter or regulation of the department made pursuant thereto....
The record supports the trial court's conclusion that Bush was operating his car in a negligent manner. Mrs. Droddy and Mr. Bonnette both saw the ruts filled with water and slowed their speed accordingly. Regardless of the exact speed of the Bush vehicle when it began to hydroplane, the trial judge correctly held that the speed was greater than was reasonable and prudent under the circumstances. A motorist is under a duty to avoid such occurrences and maintain control by keeping a lookout for possible hazards that are plainly visible to those exercising ordinary care and observation. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980). We are in accord with the trial court's conclusion that David Bush was negligent.
The last issue for our consideration concerns the damages awarded Mrs. Droddy. She contends that the damages awarded were inadequate. The trial judge summarized her damages as follows:
... Mrs. Droddy sustained severe, painful and permanent injuries in the accident. She received cerebral concussion with hematoma about both eyes; bruising of the anterior chest wall and abdomen, hematoma of the anterior wall, headache and lacerations and abrasions of the left forearm and both knees. As a result, she had retrograde amnesia and was unable to remember anything for some days after the accident. The headaches continued for almost one year, her thinking was "fuzzy" and she was unable to keep her mind on anything. She was still on prescribed medication and suffering from mental lapses on the day of the trial. She was forced to drop out of trade school, unable to perform household duties and suffered much anxiety from her memory lapses. Personality changes resulted.
The trial judge awarded Mrs. Droddy $75,000 as general damages for her injuries. This award is within the range of discretion which is vested in the trial court and we will not disturb that award. See Reck v. Stevens, 373 So.2d 498 (La.1979).
For the reasons herein assigned, the judgment appealed is affirmed in all respects. The costs of this appeal are to be assessed equally to all appellants.