414 So.2d 1273 (1982)
Mark BIALY, Plaintiff-Appellee,
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Defendant-Appellant.
No. 8683.
Court of Appeal of Louisiana, Third Circuit.
March 17, 1982.
Rehearing Denied May 10, 1982.
Writ Denied July 2, 1982.
*1274 William J. Doran, Jr., Baton Rouge, for defendant-appellant-appellee.
Trimble and Associates, Lon P. Wilson, Alexandria, for plaintiff-appellee.
Kramer & Laird, Martin Laird, III, Alexandria, for plaintiff-appellee-appellant.
Gold, Little, Simon, Weems & Bruser, Eugene J. Sues, Gist, Methvin, Hughes & Munsterman, John W. Munsterman, McLure & McLure, John G. McLure, Alexandria, for defendants-appellees.
Before CULPEPPER, GUIDRY and STOKER, JJ.
STOKER, Judge.
This case arises out of a two car collision which occurred on January 16, 1978, on a bridge over the Red River between Alexandria and Pineville, Louisiana. The bridge, commonly known as the Fulton Street Bridge, is part of the Louisiana State Highway system, and was designed, built and maintained by the State. Nancy Bialy's car crossed the median of the bridge and was struck in the opposing lane of traffic by a bread truck driven by Elbert Smith. Nancy Bialy (Mrs. Bialy) was killed in the accident, and her husband, plaintiff-appellee Mark *1275 Bialy (Bialy) brought this claim for his damages and his wife's wrongful death against defendant-appellant, the State of Louisiana, through the Department of Transportation and Development (State). Bialy's petition alleges that the State is strictly liable because the bridge in their custody was defective, or alternatively, that the State was negligent in its design, construction, or maintenance of the bridge. In a companion case[1] which we decide this date, Elbert Smith (Smith) sued Bialy and his insurer for damages, alleging that Mrs. Bialy was negligent in her operation of the vehicle. Smith also sued the State, arguing in the alternative that the State was strictly liable or liable in negligence for the accident. Both Smith's and Bialy's cases were consolidated for trial. The court found that neither Mrs. Bialy nor Smith were negligent and awarded $286,966.55 to Bialy and $530,000.00 to Smith against the State. The State appealed this judgment and Bialy and Smith answered the appeal, seeking increases in their awards.

FACTS
The Fulton Street Bridge is a lift bridge, the lift section of which is a level, open, metal grid. The rest of the bridge is concrete which slopes to meet the lift section. The bridge has two lanes of travel in each direction which at the time of the accident were divided by a concrete median ten inches high and four feet wide.
According to witnesses, Mrs. Bialy was in the right-hand northbound[2] lane travelling within the posted 50 mile per hour speed limit when her car began to "fishtail" at or close to the point at which the concrete and metal grid portions of the bridge meet. The weather was wet and near freezing, but there was no ice on the bridge. The car swerved two or three times on the metal grid and then ran against the curb of the median for a short distance. Finally, the car was thrown into the air over the median and landed in the southbound lanes of traffic, where it was struck by a Cotton Brothers Baking Company bread truck driven by Smith. The first witnesses to arrive seconds later found Mrs. Bialy dead from the impact.
The trial court gave the following written reasons for its judgment in favor of plaintiffs Bialy and Smith:
"The evidence was to the effect that neither Mrs. Bialy nor Mr. Smith was negligent; that the cause of the accident was the unsafe condition of the bridge; and that the state highway department had ample notice and failed to correct the defects prior to this tragic accident. The bridge lacked an adequate barrier between the opposing lanes; the metal grid had not been properly maintained and was dangerously slippery; the fifty mile speed limit on the bridge was unsafe; and there were no signs warning of the slippery condition of the bridge when it was wet."
The State alleges that the trial court erred in the following respects:
"I. The trial court erred in its finding that the cause of the accident was the unsafe condition of the bridge.
II. The trial court erred in failure to find Nancy Bialy guilty of contributory negligence which is attributable to plaintiff, Mark Bialy.
III. The trial court erred in awarding an excessive amount of damages to both plaintiffs."
The State also urges in a supplemental brief that should we find the State to be strictly liable under LSA-C.C. art. 2317, there is no wrongful death action under Article 2317. These arguments will be addressed below.

WAS THE BRIDGE UNSAFE?
The State contends that the trial court erred in finding that the cause of the *1276 accident was the unsafe condition of the bridge. The jurisprudence regarding this issue is summarized in Bush v. State, Through the Department of Highways, 395 So.2d 916 (La.App. 2nd Cir. 1981), writs denied, 399 So.2d 609 (La.1981), as follows:
"... The law is settled that the Department of Highways is not responsible for every accident which may occur on the state highways, nor is it a guarantor of the safety of travelers thereon, or an insurer against all injury which may result from obstructions or defects in such highways.... Generally, it is the duty of the Highway Department to construct and maintain the highways in a condition reasonably safe for persons exercising ordinary care and reasonable prudence.... (citations omitted)

United States Fidelity and Guaranty Co. v. State, Department of Highways, 339 So.2d 780 (La.1976).
"... However, reasonable care requires, and the Department does owe, a duty to the traveling public to erect barricades, signs and adequate markings to warn against extremely dangerous, trap-like hazards, unusual obstructions, perilous conditions or defects in the road.... Whether the warning is required, reasonable, or adequate is determined by the place where the danger exists, the nature of the road and the general situation and circumstances surrounding it. All of these factors, together with the kind and speed of vehicles, are to be taken into consideration to determine whether the Department has discharged its duty.... (citations omitted)

Vervik v. State, Department of Highways, 302 So.2d 895 (La.1974).
"There is no fixed rule for determining what is a dangerous defect in a public way; the facts and surrounding circumstances of each particular case control. The test usually applied, however, requires an answer to the question: Was the public way maintained in a reasonably safe condition for persons exercising ordinary care and prudence? ... (citations omitted)

Pickens v. St. Tammany Parish Police Jury, 323 So.2d 430 (La.1975)."
Plaintiffs sought to establish that the bridge was not "maintained in a reasonably safe condition for persons exercising ordinary prudence" chiefly by the testimony of Dr. Robert Brenner, an expert in safety and traffic engineering. Dr. Brenner pointed out several risk factors in the design, construction, and maintenance of the bridge, all of which made the bridge more unsafe and which, in Dr. Brenner's opinion, contributed to the causation of the accident. Dr. Brenner stated that the median separating the opposing lanes of traffic on the bridge is now recognized as dangerous for freeway use because a vehicle striking it is propelled upward and across the median which results in loss of control. A median barrier is recommended instead, preferably the so-called "New Jersey" barrier, which is designed to redirect the straying vehicle back into the proper lane while allowing the driver to regain control of the vehicle. According to the standards of the American Association of State Highway Officials, a multi-state body in which Louisiana officials participate and which promulgates highway safety standards, a median barrier was recommended for the Fulton Street bridge before the accident occurred in that the average daily traffic count on the bridge exceeded 20,000 and the median was less than 10 feet wide.
Dr. Brenner also pointed out several flaws in the design and maintenance of the metal grid on the bridge. The metal grid consists of strips of steel welded together in a "star in a box" pattern. Each strip of steel in the original design was notched to increase traction on the grid. Evidence in the form of pictures and testimony was introduced to show that there were several areas on the northbound lanes of the grid where the welds had come loose; and that there were other areas where repairs were made, but the new strips were welded inconsistently with the original pattern and were smooth instead of notched. Evidence of recognized safety standards was introduced which recommended the welding of studs at the junctures of the metal strips. This was not done in this case. Dr. Brenner also pointed out the existence of an "entry *1277 bump" consisting of a drop from the concrete portion of the bridge to the metal grid. All of these factors can cause different frictions on the different tires of a car, which makes instability and loss of control of the car more likely.
Finally, Dr. Brenner testified that the most cost-effective risk-reducing measures which the State should have taken were the lowering of the speed limit and the placement of "Slippery When Wet" signs on the bridge. Dr. Brenner stated that the fact that metal grid decks are more slippery than concrete surfaces is a well known problem, and the slipperiness of metal decks greatly increases when wet. This problem could be ameliorated if the drivers were made aware of the possible danger in advance and were made to reduce their speeds.
All of the safety measures outlined above should have been effected prior to the date of the accident, according to Dr. Brenner. If the measures had been taken prior to that time, the probability of the accident would have been "substantially reduced," and the probability of the car's crossing the median would have been "essentially zero", in Dr. Brenner's opinion.
Considering the foregoing expert testimony, there was ample evidence adduced at trial to show that the unsafe condition of the bridge was a substantial factor in the causation of the accident in question.
The State contends that the Fulton Street Bridge met the design standards in effect when the bridge was built in 1962, and that therefore the bridge was not defective. For this proposition, the State cites Roberts v. Winston Carriers, Inc., 304 So.2d 818 (La.App. 3rd Cir. 1974), writ denied, 309 So.2d 341 (La.1975). However, we fail to find support for the State's argument in that case. This court in Roberts found that a curb which was built in 1934 or 1935 was not "hazardous" and did not in fact contribute to the accident in that case which occurred in 1972. We did not rely on the fact that the curb met nationally accepted standards when built to support our finding that the curb was not in fact hazardous.[3] Furthermore, there is no showing in the Roberts case that the failure of the State to widen the highway on which the accident occurred to accommodate an increase in traffic was a causative factor in the accident.
The State also cites Shipp v. City of Alexandria, 395 So.2d 727 (La.1981) to support its contention that the bridge, even if found to be defective, did not present an unreasonable risk of harm to a driver exercising ordinary care and reasonable prudence. In Shipp, the Louisiana Supreme Court found that a hole in street pavement about an inch and a half to two inches deep was not a defect which occasioned an unreasonable risk of injury to the plaintiff. Obviously, in the instant case, the lack of proper maintenance of the bridge and the inadequate warnings to motorists,[4] as well as the lack of an adequate barrier which greatly increased the risk of dangerous head-on collisions, are "defects" which pose an unreasonable risk of injury to motorists using the bridge.

WAS MRS. BIALY CONTRIBUTORILY NEGLIGENT?
The State contends that the trial court erred in not finding Mrs. Bialy contributorily negligent. At this point, we should discuss the basis of the State's liability as found by the trial court. Although our discussion of this issue has heretofore been couched in terms of non-negligent liability under LSA-C.C. art. 2317, the trial court apparently found the State to be negligent in written reasons for judgment stating *1278 that "the state highway department had ample notice and failed to correct the defects prior to this tragic accident". Considerable evidence was introduced at trial establishing that certain officials in the highway department knew or should have known of the disrepair of the grid section of the bridge and of the desirability of a median barrier to prevent crossover accidents. However, we find that the plaintiffs have a clear basis of liability under LSA-C.C. art. 2317, and therefore we need not discuss plaintiff's allegations of negligence on the part of the State. The State's arguments concerning Mrs. Bialy's contributory negligence will still be considered in light of the fact that "victim fault" which is a defense to recovery under LSA-C.C. art. 2317 has been equated to contributory negligence. See Darbonne v. State Farm Mutual Automobile Insurance Company, 408 So.2d 300 (La.App. 3rd Cir. 1981), and the cases cited therein.
The evidence of Mrs. Bialy's actions preceding and during her crisis is necessarily speculative since Mrs. Bialy was driving alone and was killed in the accident. The State chiefly relies on the testimony of one eyewitness to the accident who surmised that Mrs. Bialy "must have stepped on the brakes `cause just all at once [the car] turned completely sideways and came across the left lane ... and hit the little median and jumped the median and this Holsum bread truck hit her." This witness and others testified that Mrs. Bialy's car "fishtailed two or three times" before spinning out of control. The State argues that stepping on the brakes was an improper response to the fishtailing and caused the car to spin uncontrollably.
The witnesses agree that Mrs. Bialy was driving straight ahead at a reasonable speed and was not trying to pass anyone when her car began to fishtail. Under these circumstances, it is likely that the condition of the bridge caused her initial dilemma. If Mrs. Bialy did in fact react improperly in trying to regain control of her car, she cannot be found guilty of contributory negligence for doing so. One who suddenly finds himself in position of imminent peril, without sufficient time to consider and weigh all circumstances or find the best means to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself was brought about by his own negligence. This "doctrine of sudden emergency" is appropriate in the consideration of fault as it bears upon contributory negligence as well. Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385 (La.1972).
The emergency which Mrs. Bialy found herself facing when she allegedly reacted improperly was not a product of her own negligence, but of the State's negligence or of the defective condition of the bridge in the State's custody and control. Therefore, Mrs. Bialy is not guilty of contributory negligence which would defeat her cause of action under LSA-C.C. art. 2315, or of "victim fault" which would defeat her cause of action under LSA-C.C. art. 2317.

WRONGFUL DEATH UNDER LSA-C.C. ART. 2317
The State in a supplemental brief contends that there is no wrongful death action available under Civil Code article 2317. The argument is basically that the wrongful death action is a statutory creation found in Civil Code article 2315, and is not available in an action based on Article 2317 because of the apparent holding of our Supreme Court in Loescher v. Parr, 324 So.2d 441 (La.1975), and Jones v. City of Baton Rouge, 388 So.2d 737 (La.1980) that Civil Code article 2317 embodies a cause of action separate and distinct from that found in Article 2315.
Having found that the State is liable under Civil Code article 2317, however, we find further that there is a cause of action under LSA-C.C. art. 2317 for Mrs. Bialy's wrongful death.
The actions for wrongful death and survival are found in LSA-C.C. art. 2315, the pertinent parts of which are as follows:

*1279 "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
* * * * * *
"The right to recover all other damages caused by an offense or quasi offense, if the injured person dies, shall survive for a period of one year from the death of the deceased in favor of: (1) the surviving spouse and child or children of the deceased, or either such spouse or such child or children; (2) the surviving father and mother of the deceased, or either of them, if he left no spouse or child surviving; and (3) the surviving brothers and sisters of the deceased or any of them, if he left no spouse, child, or parent surviving. The survivors in whose favor this right of action survives may also recover the damages which they sustained through the wrongful death of the deceased...."
Speaking of the word "fault" in the first paragraph of LSA-C.C. art. 2315 as it relates to Articles 2316 through 2324, the Louisiana Supreme Court in Loescher v. Parr, supra, stated:
"The remaining articles [2316-2324] constitute an amplification as to what constitutes `fault' and under what circumstances a defendant may be held liable for his act or that of a person or thing for which he is responsible."
The Court continues by showing that LSA-C.C. art. 2316 is the basis for liability for negligent fault in Louisiana, whereas LSA-C.C. art. 2317 provides for liability based on non-negligent fault. Thus, LSA-C.C. art. 2315 is the article upon which all delictual responsibility is based and upon which LSA-C.C. arts. 2316 through 2324 depend.
Therefore, it is to be expected that the legislature would place the language embodying the wrongful death and survival actions in LSA-C.C. art. 2315 to indicate that it intended these actions to apply to all of the articles which are based upon LSA-C.C. art. 2315. This legislative intent is further shown by the fact that the survival and wrongful death actions are defined in the language added to LSA-C.C. art. 2315 as "[t]he right to recover all other damages caused by an offense or quasi offense, if the injured person dies ..." (emphasis supplied). The elements of offenses and quasi offenses are contained in LSA-C.C. arts. 2315 through 2324 and are not limited to any one of those articles. "Offense" and "quasi offense" are broad terms that include claims for negligent, non-negligent, and intentional delicts. Therefore, the right of certain designated beneficiaries to recover damages for the wrongful death and survival of an injured person as found in LSA-C.C. art. 2315 is applicable to actions for non-negligent delicts brought under LSA-C.C. art. 2317.[5]

QUANTUM
As its third assignment of error, the State contends that the trial court abused its discretion with respect to the awards granted to both plaintiffs. The award to Bialy will be discussed below. The award to Smith will be discussed in a separate opinion rendered this same date, as mentioned above.
The trial court awarded the following damages to Bialy:

"His wife's suffering prior to death $ 10,000.00
General Damages for the loss of
 his wife 150,000.00
His economic loss resulting from
 the death of his wife 125,000.00
Funeral expenses 1,966.65
 __________
 TOTAL $286,966.65"

The State complains of the amounts awarded for two of these elements of damages: the award for Mrs. Bialy's suffering prior to death, and the award for Bialy's economic loss resulting from his wife's death.
*1280 To show that Bialy failed to prove that his wife suffered any pain prior to her death, the State points out that two of the first witnesses to arrive at the scene of the accident testified that Mrs. Bialy showed no signs of life when they saw her. Wilbur Newsome, who was driving behind the bread truck when it struck Mrs. Bialy's vehicle, stopped immediately after the accident to render assistance. He could not feel Mrs. Bialy's pulse, so he turned his attention to the driver of the bread truck. Melvin Vallery, who was ahead of the bread truck in the same lane at the time of the accident, stopped his truck and went back to the scene. Mrs. Bialy showed no signs of life at that time, even though a woman was already trying to revive her through mouth-to-mouth resuscitation. No witness testified that he saw Mrs. Bialy alive after the accident, even for a brief moment. Under these circumstances, Bialy failed to prove that his wife experienced any conscious pain or suffering prior to her death. Therefore, the award of $10,000 for her suffering must be disallowed. Cf. Daniels v. Conn, 382 So.2d 945 (La.1980); and Blanchard v. Rodrigue, 340 So.2d 1001 (La.App. 1st Cir. 1976), writs denied, 341 So.2d 1129, 1130 (La.1977).
With regard to the award for Bialy's economic loss from his wife's death, the State complains of the admission of evidence introduced at trial of Mrs. Bialy's potential earnings as a nurse, even though she was a part-time student employed at the minimum wage at the time of her death. The State also complains of the admission of evidence of the economic value of Mrs. Bialy's household services which was introduced at trial. Bialy counters these arguments by contending that the trial court failed to take into account the expected increase in Mrs. Bialy's earnings should she have later been employed as a nurse. He also complains that the trial court failed to consider the value of Mrs. Bialy's household services in making its award. Bialy seeks an increase in the award to include these damages.
Mrs. Bialy was 26 years old and was working full-time at a shoe store for $2.75 per hour at the time of her death. She was a part-time student and had completed one year of a two-and-a-half year nursing curriculum. Dr. George Rice, an expert economist, set Mrs. Bialy's work life expectancy had she lived at 29.2 years. Dr. Rice also said he expected the minimum wage to increase by 8½% per year, a figure roughly offset by his discount factor of 9%. Dr. Rice testified further that the value of a housewife's services is "in the six to eight thousand dollar range." Max Allen Crane, director of personnel at Rapides General Hospital, testified that starting registered nurses with no experience make $6.92 per hour for a 40 hour week at the hospital, and that immediate employment was available for nurses.
The trial court awarded to Bialy $125,000 for the economic loss he suffered from his wife's death. Mrs. Bialy's total earnings during her projected work-life of 29.2 years would have been $160,000, assuming she continued to make $2.75 per hour for a forty hour week and worked fifty weeks a year. Since the expected rise in the minimum wage would be roughly offset by the discount factor proposed by Dr. Rice, there is no need to include as factors either of these figures.
It is obvious that the trial court did not give great weight to the evidence of Mrs. Bialy's potential career as a nurse or of her economic value as a housewife. Perhaps he was influenced by the fact that she had completed less than half of her required nursing studies, and the fact that no evidence of her services as a housewife was introduced. It is also possible that her household services were included as a factor in the general damages awarded to Bialy for his wife's death. The trial judge may have also considered the fact that Mrs. Bialy was a young married woman of childbearing years whose working career may have been interrupted by the demands of raising a family. In any case, we feel that the award of $125,000 to Bialy for his economic loss resulting from the death of his wife is reasonably supported by the record. This sum, as well as the sum awarded for general damages, is within the "much discretion" of the trial court and will not be *1281 disturbed on appeal by this court. Reck v. Stevens, 373 So.2d 498 (La.1979).
Therefore, for the foregoing reasons, we affirm the trial court's ruling except to amend the award of damages to delete the award of $10,000 to Bialy for his wife's suffering prior to death.
AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] Smith v. Lumberman's Mutual Casualty Co., et al., 414 So.2d 1281 (La.App. 3rd Cir. 1982).
[2] The Fulton Street Bridge runs generally northeast towards Pineville and southwest towards Alexandria, but for the sake of convenience we shall refer to the direction towards Pineville as north and that towards Alexandria as south.
[3] Roberts v. Winston Carriers, Inc., supra, was not a case tried under LSA-C.C. art. 2317. However, we presume that the definition of "hazardous" in that case would be similar to the jurisprudential requirement of an unreasonable risk of harm for purposes of liability under LSA-C.C. art. 2317. See Jones v. City of Baton Rouge, 388 So.2d 737 (La.1980).
[4] There was some disputed evidence at trial that there was an "Ice On Bridge" sign displayed at the time of the accident. The trial court must have either doubted that the sign was displayed, or must have felt that it did not convey an adequate warning to motorists.
[5] The Second Circuit, in its recent decision of Laborde, et al v. Eagle Trucking Co., et al, 409 So.2d 1266 (La.App. 2nd Cir. 1982), agrees with our holding in the following language from that case:

"The right to recover damages if the injured person dies because of a C.C. 2317 offense or quasi offense is set forth in C.C. 2315..."
The issue in the Laborde case was whether the right to recover damages for wrongful death under LSA-C.C. art. 2317 was more extensive than that found in LSA-C.C. art. 2315.