561 So.2d 857 (1990)
James BURKETT, et ux., Plaintiffs-Appellants,
v.
Robert HONEYMAN, et al., Defendants-Appellees.
Karen L. STANLEY, Plaintiff-Appellant,
v.
CITY OF SHREVEPORT, et al., Defendants-Appellees.
Nos. 21348-CA, 21349-CA.
Court of Appeal of Louisiana, Second Circuit.
May 9, 1990.
Rehearing Denied June 14, 1990.
*858 Wiener, Weiss, Madison & Howell by John M. Madison, Jr., Shreveport, for James Burkett, et ux., plaintiffs-appellants.
Nelson, Hammons & White by John L. Hammons, Shreveport, for Karen L. Stanley, plaintiff-appellant.
Office of the City Atty., Charles C. Grubb, City Atty. by Henry M. Bernstein, and Blanchard, Walker, O'Quin & Roberts by James W. Wyche, Shreveport, for City of Shreveport, defendant-appellee.
Before HALL, MARVIN and SEXTON, JJ.
SEXTON, Judge.
The plaintiffs in these consolidated appeals complain of the district court's rendition of judgments in favor of defendant city of Shreveport in a personal injury lawsuit involving two automobiles, the collapse of a bridge span, a death, bodily injuries, and property damage. We affirm.
On October 20, 1985, at approximately 2:40 a.m., a white 1975 four-door Cadillac *859 driven by Robert Honeyman and carrying two guest passengers struck the right girder of the northwest span of the Old Blanchard Road bridge at approximately 50 to 55 miles per hour, bending the girder, depriving that span of one of its main load-bearing components, and causing the collapse of that span of bridge.
Unfortunately, the Cadillac did not come to rest when it struck the girder. Instead, the momentum of the automobile and the angle of the girder combined to vault the automobile into the air, flip, land on its roof, and finally to slide over 100 feet from the initial point of impact with the girder.
The front seat guest passenger, Reginald Stanley, died from cardiorespiratory failure when his neck was hyperflexed forward, dislocating his spine and lacerating his spinal cord.
At the same moment that the bridge was struck, James and Mayme Burkett were about to exit the bridge, proceeding in the opposite direction as that of Honeyman. As the bridge span collapsed, the roadway on which the Burketts were driving changed from a horizontal to an inclined plane. Their car vaulted off the end of the span and crashed into the highway just beyond a gap which formed as the collapsing span pulled away from the highway and fell into the ravine below. Their car was damaged beyond repair, and Mrs. Burkett sustained a compression fracture of a thoracic vertebra. Mr. and Ms. Burkett also sustained other minor injuries.
Mr. and Mrs. Burkett filed suit against the city of Shreveport (the owner of the bridge), Honeyman (the driver of the vehicle causing the bridge's collapse), and Safeco Insurance Company (the Burketts' insurance carrier for uninsured or underinsured motorist coverage). Karen Stanley, the decedent's widow, filed suit against the city of Shreveport and Honeyman.
Following a trial on the merits the district court, in written reasons ruled in favor of the Burketts and against Safeco for those personal injuries which were caused by Honeyman, an uninsured motorist. All of the Burketts' demands against the city of Shreveport were rejected. Mrs. Stanley's demands against the city were similarly rejected.
Plaintiffs now appeal these unfavorable decisions and ask this court to reverse the district court's judgments on liability and render judgments on damages.[1]
For reasons which will become more apparent from the discussion below, we will consider the appeal and arguments presented by the Burketts and Karen Stanley separately.
As noted previously, James and Mayme Burkett were driving across the bridge when Honeyman struck the end girder and caused the collapse of one of the bridge's three spans. As the span collapsed into the ravine below, it formed an inclined plane off of which the Burkett vehicle vaulted and crashed into the highway which led to the bridge. The evidence clearly shows that they were free from fault in the accident.
The Burketts' first argument is that the city should be held strictly liable for Mrs. Burkett's damages because of its ownership of a defective thing[2] or building[3] or because of its negligence.[4] They argue that the bridge presented an unreasonable risk of harm, that the city knew of such risk, and that the city failed to take any steps to prevent injury. The city argues that it was not the condition of the bridge which was the cause of the injuries and damages, but it was the actions of Robert Honeyman. The district court *860 found that the bridge was structurally sound enough to carry vehicles of no more than the posted weight limit and that it was properly signed to warn motorists of the bridge's limitations.
This argument presents the initial issue of whether, under the circumstances, the city was negligent for failing to repair the bridge or to take rehabilitative measures to make the bridge safer, or whether the city should be held strictly liable for its ownership of an allegedly defective bridge which plaintiffs claim was the cause of their harm.
... The law is settled that the Department of Highways is not responsible for every accident which may occur on the state highways, nor is it a guarantor of the safety of travelers thereon, or an insurer against all injury which may result from obstructions or defects in such highways.... Generally, it is the duty of the Highway Department to construct and maintain the highways in a condition reasonably safe for persons exercising ordinary care and reasonable prudence....

United States Fidelity and Guaranty Co. v. State, Department of Highways, 339 So.2d 780 (La.1976)
... However, reasonable care requires, and the Department does owe, a duty to the traveling public to erect barricades, signs and adequate markings to warn against extremely dangerous, trap-like hazards, unusual obstructions, perilous conditions or defects in the road.... Whether the warning is required, reasonable, or adequate is determined by the place where the danger exists, the nature of the road and the general situation and circumstances surrounding it. All of these factors, together with the kind and speed of vehicles, are to be taken into consideration to determine whether the Department has discharged its duty....

Vervik v. State, Department of Highways, 302 So.2d 895 (La.1974).
There is no fixed rule for determining what is a dangerous defect in a public way; the facts and surrounding circumstances of each particular case control. The test usually applied, however, requires an answer to the question: Was the public way maintained in a reasonably safe condition for persons exercising ordinary care and prudence? ...

Pickens v. St. Tammany Parish Police Jury, 323 So.2d 430 (La.1975).

Bush v. State, Department of Highways, 395 So.2d 916, 920-921 (La.App. 2d Cir.1981), writ denied, 399 So.2d 609 (La. 1981) (emphasis ours).
We agree with the district court's conclusion that the bridge was in a condition which was reasonably safe for persons exercising ordinary care and reasonable prudence. This bridge had a weight limit of three tons, was located on a minor highway which had a posted speed limit of 35 miles per hour, and was clearly marked in such a fashion that, had Robert Honeyman been exercising ordinary care and reasonable prudence, the accident would almost certainly not have occurred.
The Burketts next argue that the city should have repaired, replaced, or closed the bridge following bridge inspections by the Department of Transportation and Development (DOTD) starting in 1975. They argue that the total rating given the bridge at that time and thereafter amounted to a recommendation that the structure be closed until rehabilitative measures were taken or until it was replaced by a new structure. The city argues that it was never ordered to close the bridge and that there was never a recommendation that the bridge be closed. It further argues that the city had decided to replace rather than repair the bridge and that procedures had been underway for some time before the accident to facilitate the replacement.
The district court concluded that the state's bridge inspectors had not recommended closing the bridge, only repairing it.
Whether the DOTD ordered or recommended to the city that the bridge be *861 closed is a factual issue. In that regard, our supreme court has recently reiterated Louisiana's well-established standard of appellate review:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring, 283 So.2d 716, 724 (La.1973). See also, Sevier v. United States Fidelity & Guaranty Co., 497 So.2d 1380, 1383 (La.1986); West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1150 (La.1979); Davis v. Owen, 368 So.2d 1052, 1056 (La.1979); Cadiere v. West Gibson Products Co., 364 So.2d 998, 999 (La.1978); A. Tate, "Manifest Error" Further observations on appellate review of facts in Louisiana civil cases, 22 La.L. Rev. 605, 611 (1962). The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Arceneaux, supra at 1333, Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La. 1985). In applying the manifestly erroneous-clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. See, F. Maraist, The Work of the Louisiana Appellate Courts for the 1978-1979 TermA Faculty Symposium, Civil Procedure, 40 La.L.Rev. 761, 764 (1980); Comment, Appellate Review of Facts in Louisiana Civil Cases, 21 La.L.Rev. 402, 412 (1961); Cf. Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).
Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989) (footnote omitted).
After reviewing the entire record in this matter, we conclude that the district court's finding is not manifestly erroneous. The bridge inspector responsible for most of the evaluations of the bridge in question testified that there was no recommendation that it be closed. He specifically testified that the city could choose to either close it or keep it open to light traffic. The city chose to reduce the weight limit and restrict its use to that of a one-lane bridge while taking steps for its replacement.
Accordingly, we find no merit to the Burkett's argument that the city should have closed the bridge. Having decided that, however, we now turn to their arguments that the city should have taken other steps to make the bridge safer.
The Burketts next argue that the city should have installed additional warnings to alert oncoming motorists of the limited nature of the bridge. Specifically, they argue that an automatic traffic signal should have been installed to control the traffic flow rather than attempting to do so merely through the use of warning signs. The city argues that the Burketts failed to prove that the lack of such a system was the cause of the accident. The district court rejected the argument that the city was negligent in not installing traffic lights to control the traffic flow on the bridge.
At the time of the accident, in addition to a sign limiting use of the bridge to vehicles weighing not more than three tons, there was another combination of signs which, in conjunction, warned motorists to yield to traffic already on the bridge. The sign combination consisted of a red inverted triangular "YIELD" sign to which was attached a white rectangular sign with "TO *862 TRAFFIC ON BRIDGE" written in black letters. This combination should have left no doubt in the mind of any approaching motorist as to the appropriate conduct under the circumstances presented here. A reasonably prudent motorist would have come to a complete stop until the Burkett vehicle had exited the bridge.
However, on the night in question, Robert Honeyman was not a reasonably prudent motorist. He was highly intoxicated, driving almost twenty miles per hour over the posted speed limit, and having difficulty in keeping his vehicle on the highway. The district court apparently concluded that the plaintiffs had failed to prove that any additional warnings would have had any effect on Honeyman. Our review of the record fails to disclose that this conclusion is clearly wrong. The district court's findings are reasonable in light of the record, reviewed in its entirety, and we may not reverse even if we might have viewed the evidence differently than the district court. Rosell v. ESCO, supra, at 844. Accordingly, we find no merit to this argument.
Finally, the Burketts argue that the city should have installed guardrails to prevent the girder from being struck and to funnel traffic onto the bridge. The district court found that the installation of guardrails would have narrowed the entrance onto the bridge on either side and would have greatly increased the risk of a head-on collision with a driver such as Honeyman.
The district court's conclusion was reasonable in light of the evidence in the record. A videotape animation of what might have happened had guardrails been in place was introduced into evidence. It shows that, had the guardrails been there, instead of crashing into the girder, Honeyman's vehicle would probably have been directed head-on into the Burkett vehicle. Given the relative speeds at which these two vehicles are estimated to have been traveling, the consequences of such a scenario seem likely to have been as bad or worse than that which transpired, perhaps involving more than one fatality. Accordingly, we find no merit to the Burketts' argument that the city should have placed guardrails in front of the end girders.
Finding no merit to any of the arguments put forth by the Burketts, we affirm the district court's judgment denying relief to the Burketts. Additionally, to the extent any of the arguments raised by Mrs. Stanley have been considered and disposed of above, we will not reconsider them.
The arguments raised by Mrs. Stanley differ from those raised by the Burketts solely from the perspective of the legal cause of Reginald Stanley's death. While the Burketts' accident and resulting damages were caused by the collapse of the bridge, which itself resulted from being struck by the Honeyman vehicle, Stanley's death resulted when the Honeyman vehicle landed upside down and his neck was broken.
The fatal accident resulted when Honeyman's vehicle struck the right girder of the northwest side of the bridge, rode up the girder a short distance, vaulted off the girder, rotated in a counterclockwise motion, finally crashing down on its roof and causing Stanley's death. The district court specifically found that Stanley was not killed because the bridge collapsed, but as a result of the auto accident which in turn caused the bridge to collapse.
The instant record supports the district court's conclusions that the cause of Reginald Stanley's death was not the collapse of the bridge but the conduct of his host driver. As noted by the district court, there is no doubt that Reginald Stanley would not have been killed if the bridge had been closed; however, we have already found that the city was never ordered or recommended to close the bridge. Thus, for these reasons, in addition to those assigned above, we conclude that there is no merit to any of the arguments set forth by Mrs. Stanley.

CONCLUSION
The instant record does not disclose that the district court's factual conclusions are clearly wrong. We therefore affirm its *863 judgment. All costs of this appeal are to be divided evenly between the Burketts and Mrs. Stanley.
AFFIRMED.
MARVIN, J., dissents and assigns written reasons.
MARVIN, Judge, dissenting.
I respectfully dissent in these respects:
The Burkett plaintiffs were injured "by the collapse of the bridge," according to the trial court. This is a finding of substantial cause in fact.
The City knew for several years that the bridge was unsafe and in imminent and foreseeable danger of collapsing. The City's agents and all other experts agreed on this point.
A bridge of this type, erected in 1908, simply was not and is not designed to withstand the impact of a motor vehicle traveling at any speed, 15 or 50 mph, according to the experts and particularly, the City's expert, Joseph Murphy, the District Bridge Inspector for the State DOTD. The City knew this.
Notwithstanding this knowledge, the City deliberately chose to continue the bridge in service and offer only a nebulous "warning" to traffic, which ranged from 3,000 to 6,000 vehicles each day and night.
The critical issue, and my disagreement with the majority, concerns the City's duty to protect and warn against the risk to a degree that was reasonably commensurate with the danger. The majority states the finding that the bridge was "properly signed" and emphasizes that Honeyman, "highly intoxicated" and driving about 50-55 mph, 15-20 miles over the speed limit, was "having difficulty keeping his automobile on the highway."
Before concluding whether the City "properly signed" the bridge, I would seek answers to questions about the City's duty to protect and warn against the unreasonable risk of danger posed by the bridge.

WHAT WAS THE DANGER?
The danger, of course, was that the bridge would collapse, either from (1) the weight of a vehicle on it or from (2) being struck by a vehicle that was either (a) on the bridge or (b) approaching the bridge.

WHAT WAS THE CITY'S DUTY?
The City's duty, of course, was either to correct or reasonably warn of that danger. Whether the warning is reasonable is determined by the nature of the danger, the surrounding circumstances, and the kind [number] and speed of the vehicles using the roadway or bridge. See Vervik v. State, Department of Highways, 302 So.2d 895 (La.1974); Bush v. State, Through Dept. of Hys., 395 So.2d 916 (La.App. 2d Cir.1981), writ denied.
The duty is directly commensurate with the risk created by "extremely dangerous, trap-like hazards ... perilous conditions or defects in the road." Bialy v. State, 414 So.2d 1273 (La.App. 3d Cir.1982), writ denied. There the State knew that the surface of the metal-grid roadway of a bridge, especially when wet, was more slippery than the concrete surface of the bridge. The State warned, if at all, only of "Ice on Bridge." Holding the State liable for the damage caused by the defect, the court found that the State could have easily and economically posted signs to reduce the speed of traffic to some stated speed that was deemed reasonable and to warn that the bridge was "Slippery When Wet."
In Bialy, the court additionally found that the State knew that the median barrier separating traffic was dangerous because any vehicle striking the barrier would be propelled upward and across the median and into the opposing traffic. The court concluded
[T]he inadequate warnings to motorists [and] ... the lack of an adequate barrier... are "defects" which pose an unreasonable risk of injury ...
414 So.2d at 1277.
The breach of the duty to warn of a dangerous highway condition may constitute *864 legal fault notwithstanding the negligence of one or both drivers involved in the collision. Wall v. American Emp. Ins. Co., 377 So.2d 369 (La.App. 2d Cir.1979), affirmed 386 So.2d 79 (La.1980).
The cost of any burden imposed [on a public body] by the strict liability [for maintaining a defective thing] can be spread widely among the persons who enjoy [the use of the thing]. The potential for harm is great [where] the [thing] is heavily used at all hours ... Landry v. State, 495 So.2d 1284, 1288 (La.1986). There, the levee board was held liable to a negligent crab fisherman who stepped into a hole adjacent to the Lake Pontchartrain seawall that was caused by "natural wave action and erosion." CC Art. 2317 was applied.
Similarly, in Briggs v. Hartford Ins. Co., 532 So.2d 1154 (La.1988), DOTD was held liable to a negligent motorist for maintaining at a "dangerous intersection" a stop sign that was "partially obscured" by foliage. CC Art. 2315 was applied.
In each of the above two cases the court mentioned that the public body knew or should have known of the dangerous condition. Here the City knew for years that the bridge would readily collapse upon almost any impact by a vehicle.
The reports of inspections of the bridge that were periodically made to the City repeatedly stated:
This is a one-lane bridge with no approach guardrail, hazard markers or clearance signs.
Excessive vegetation around bridge needs to be cut.
The fact that Honeyman was greatly negligent (drunk, speeding, and perhaps out of control) does not relieve the City of its duty to protect against and to warn of the dangerous condition of the bridge.
The Burketts were injured by the collapse of the bridge even though the collapse was triggered or caused in part by the impact of Honeyman's car.
But for its design, condition, and age, the bridge would not have collapsed when Honeyman ran into it. Both Honeyman's neglect and the City's neglect were substantial causes in fact of the Burketts' injuries.

WHAT DID THE CITY DO IN RESPONSE TO ITS KNOWLEDGE?
The scene is essentially rural and is depicted in many photographs in the record. The blacktopped roadway is narrow. The shoulder is narrower and ends at the *865 bridge which is 17.5 feet wide. This photo depicts the appraoch to the bridge. The second sign is "NO PARKING AT ANY TIME." *866 This photo depicts the next signpost, at the top of which is mounted a conventionally painted, triangular "YIELD" sign. Beneath the "YIELD" sign is mounted a rectangular white sign with black letters "TO TRAFFIC ON BRIDGE." The "WEIGHT LIMIT" sign is a few feet beyond this signpost and is within a few feet of the bridge:

None of these signs is lighted.
They are singular and not "repeated" signs.
Nothing alerts an approaching driver that the bridge is 1,000 or 500 feet away or that an approaching vehicle may be on the bridge.
Nothing alerts a driver to reduce his speed to a speed below the 35 mph posted limit on the highway.
Nothing alerts a driver that conditions ahead of him are dangerous in any sense, especially not extremely dangerous to the extent that the bridge will collapse if struck by a car.
Nothing protects the end or the sides of the bridge or diverts potentially impacting traffic away from the structure.
The signs and their placement do not comply with any of the sign manuals in evidence.
At the worst, the signs compound the trap that lies ahead especially for the inattentive or alcohol-impaired, and thus negligent, driver.
At best, the order of the signs, "ONE LANE BRIDGE," "YIELD ...," "WEIGHT LIMIT 3 TONS," suggest only that the bridge will not support the weight of more than one car. Each sign complements the others and conveys the same message.
The signs near the bridge, "YIELD TO TRAFFIC ON BRIDGE," and "WEIGHT LIMIT" do nothing to tell the approaching driver that the bridge is in danger of collapsing. They imply "if the way is clear, you may continue across this bridge at the speed limit that is posted on the highway (35 mph)."
The absence of several lighted and sequential signs beginning a thousand feet or more from the bridge (DANGER, BE PREPARED TO STOP, SLOW TO 10 MPH, ONE LANE BRIDGE 500 [300, etc.] FEET AHEAD, WATCH FOR TRAFFIC ON BRIDGE) also suggests that a driver may safely (?) approach the bridge at the posted *867 speed limit without regard to any danger other than a weight limit of one car at a time on the bridge.
Moreover, the existing signs are not lighted so as to better attract the attention of an inattentive or handicapped nighttime driver. This record shows that signs that are reasonably commensurate with the danger could have been erected at almost no cost to the City. The evidence shows that a more sophisticated semaphore control system could have been installed for $8,000 or less. Flashing lights could have been installed for much less.
The Burkett plaintiffs were at least halfway across the bridge when Honeyman reacted to the lights of the Burkett vehicle and lost control. The City should have contemplated that the lights of a car on the bridge would either confuse, impair, or interfere with, the observation of a driver approaching the bridge and cause an undue reaction.
Lighted signs directing each driver to slow his or her speed, to "dim" and then "blink" or "flash lights" while on the bridge, could have been posted at proper distances to alleviate some of the danger for little or no cost. Barriers and guard rails could have been installed for little cost. The inspection reports imply this. "This is a one-lane bridge with no approach guardrail, hazard markers or clearance signs."
I would conclude, then, that the City failed in its duty to protect and warn against the risk that caused the injury to the Burkett plaintiffs.
The Burketts were not at fault. They were not struck by Honeyman's car. The dangerous condition and resulting collapse of the bridge legally caused, in part, their injuries. The breach of the City's duty renders the City liable to the Burketts. Honeyman should also be liable to the Burketts even though his car did not strike the Burkett car. The City is at least 50 percent at fault insofar as the Burketts are concerned. The bridge would not have collapsed if it had been designed in more modern times. The bridge may not have collapsed if the City had attempted to protect it against vehicular impact and posted warnings commensurate with the risk.
Insofar as the Stanley widow is concerned, her husband, who was drinking with Honeyman, is relatively equal in fault to Honeyman. The collapse of the bridge did not cause Stanley's death. The City allowed the "trap" to exist. The "trap" and Honeyman's fault caused Stanley's death. I would suggest that as to Stanley's widow, Honeyman was about 80 percent at fault and the City was 20 percent. Stanley should be cast with some of the fault attributable to Honeyman because he was drinking with Honeyman.

CONCLUSION
I would reverse the judgment and award damages to each of the plaintiffs, allocating no fault to the Burketts and some fault to the City and to Honeyman and Stanley.

ON APPLICATION FOR REHEARING
Before HALL, MARVIN, SEXTON, FRED W. JONES, Jr. and NORRIS, JJ.
Rehearing denied.
NOTES
[1] The district court did not render judgments against Honeyman because he had failed to answer or appear. None of the appellants complain thereof. Additionally, neither the Burketts nor Safeco complain of the judgment rendered against the insurance carrier under its uninsured motorist coverage. Finally, the Burketts do not seek review of the district court's decision regarding James Burkett's claim and limit the relief sought to the claims brought by Mayme Burkett against the city.
[2] LSA-C.C. art. 2317.
[3] LSA-C.C. art. 2322.
[4] LSA-C.C. art. 2315.