428 So.2d 1251 (1983)
Jack G. COPELAND, Plaintiff-Appellee,
v.
LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Defendant-Appellant.
No. 82-568.
Court of Appeal of Louisiana, Third Circuit.
March 9, 1983.
*1252 Ronald R. Thompson, Baton Rouge, for defendant-appellant.
Domengeaux & Wright, Richard C. Broussard, Lafayette, for plaintiff-appellee.
Before STOKER, DOUCET and YELVERTON, JJ.
STOKER, Judge.
Plaintiff was awarded judgment in the trial court for injuries received in a three vehicle collision at the intersection of Castille Street and the Evangeline Thruway (U.S. Highway 167) in Lafayette, Louisiana. There is only one defendant, the State of Louisiana through the Department of Transportation and Development. Plaintiff alleges in his petition that his injuries were caused by defendant's negligence in the maintenance, design and operation of the intersection and because of the lack of proper signalization, channelization, and control of the intersection. Defendant answered stating that the sole cause of the accident consisted of various actions of plaintiff: the failure of plaintiff to yield to oncoming traffic, his failure to appreciate conjested road conditions, his failure to maintain control of his vehicle, his being inattentive to his driving requirements, and other acts committed by the plaintiff. Alternatively, defendant alleges plaintiff's actions amounted at least to contributory negligence. The trial court exonerated the plaintiff from any negligence whatsoever and found that "the State had a duty to protect against the precise risk of injury that in fact occurred."
The issues on appeal are whether the trial court erred in:
1) Failing to find the plaintiff contributorily negligent.
2) Finding the proximate cause of the accident to be the actions of the State of Louisiana, Department of Transportation and Development.
3) Awarding excessive damages to the plaintiff.

FACTS
Plaintiff was driving his vehicle and carrying a co-worker with him at the time of the accident. At the site of the accident, U.S. 167 is a four-lane divided highway with adjacent service roads on each side. Grass covered medians separated the northbound and southbound lanes and such medians separated the main lanes from the service roads. Castille Street completely crosses the highway and service roads as shown schematically on Exhibit One made a part of this opinion. Plaintiff's vehicle was traveling in a westerly direction and was attempting to cross the southbound double lanes of U.S. 167 from the main or center median which divides the highway. Before plaintiff's vehicle completed its maneuver it was struck by. a tractor-trailer traveling south in the outside or west-most lane of the highway. Plaintiff testified that after stopping at a stop sign in the center median, he was attempting to gain access to the service road on the west side of the highway. A vehicle driven by John R. Scott had been stopped in the southbound lane at the stop sign on the west service road. Plaintiff testified that as he was stopped at the stop sign on the center median he looked to his right to see if the outside lane of the two southbound lanes was clear of traffic, but his vision was obscured by four to six vehicles waiting to turn left into Castille Street from the inside southbound lane of the highway. Plaintiff perceived that the outside lane was clear. He testified that after he left the stop sign and had "committed" *1253 himself to crossing the highway, John R. Scott's vehicle turned left from the west service road stop sign. In so doing Scott angled across plaintiff's intended path of travel on the section of pavement connecting the west service road to the southbound lanes of the highway. Apparently there were no channelization devices on that section of pavement to prevent this sort of angling maneuver. Plaintiff testified that because of Scott's maneuver he was blocked from proceeding onward into or across the west service road and was forced to stop with the rear of his vehicle in the outside lane of this southbound portion of Highway 167. At that point the impact occurred which caused the injuries he complains of. The force of the initial impact caused plaintiff's vehicle to strike John R. Scott's vehicle.
There is unequivocal and unchallenged evidence that plaintiff suffered some degree of brain damage as a result of the accident which has prevented or will prevent him from achieving the high degree of skill and advancement in his chosen profession of accounting that he normally would have achieved had he not suffered his injuries.

I. LIABILITY

Contributory Negligence.
Defendant contends there are two bases upon which this Court of Appeal should find that plaintiff was contributorily negligent.
First, defendant argues that the trial judge erred in finding as a fact that the Copeland vehicle was blocked by the Scott vehicle, and that Copeland was prevented from proceeding safely through the intersection. Second, defendant argues that plaintiff breached his duty to proceed across the intersection safely by failing to notice the oncoming tractor-trailer rig and by failing to notice that the Scott vehicle would cut him off.
As to the first contention, under prevailing standards of appellate review, an Appeal Court may not freely substitute its factual findings for those of the trial court but may do so only when the record reveals the trial court is clearly wrong. We find no basis for reversal on this issue.
With reference to the second contention, the risk that the plaintiff would be injured under such circumstances as he was must fall within the scope of plaintiff's duty to proceed across the intersection safely. More precisely, the issue is did the risk that plaintiff would be cut off by an automobile after he committed himself to crossing the intersection and that he would be struck by a vehicle whose lane he had blocked as a result of being prevented from completing his crossing fall within the scope of the obvious duty he had to proceed safely across the intersection? We believe the answer is no.
Under our appreciation of the evidence plaintiff would have had time to safely cross the southbound lanes had he not been blocked by Scott's vehicle. Plaintiff testified that he looked to his right and did not see any vehicle in the outside lane. He then proceeded and was physically prevented from going further by the Scott vehicle. Plaintiff testified that he was forced to look through the windshields of the left-turning vehicles and could see from one hundred to three hundred feet down the outside lane. Plaintiff was not contributorily negligent merely because he proceeded across the southbound lane.
The trial court found that the plaintiff stopped because he had no other choice. The trial court found that the Scott vehicle was "angling out" toward the Copeland vehicle. The trial court places great weight on plaintiff's testimony that plaintiff could not predict Scott's direction and saw no alternative but to stop. The plaintiff had no duty to predict or anticipate the action of the Scott vehicle. Plaintiff was cut off by Scott after he left the stop sign. The evidence is unequivocal on that point.
Defendant contends that the trial court erred in applying the "sudden emergency doctrine". The trial court does not state in *1254 its reasons for judgment that it is applying the doctrine. However, the trial court does state that the plaintiff was placed in a position of sudden emergency and could not be held to be contributorily negligent because, upon hindsight, the plaintiff could have possibly have taken some action to minimize his damages. Defendant contends that the plaintiff cannot benefit from the sudden emergency doctrine because he was negligent in putting himself in the position of danger.
Since we accept the trial court's reasoning that plaintiff acted reasonably under the circumstances, and the trial court found no negligence on the part of the plaintiff, we do not believe the trial court erred to the extent that it may have applied the doctrine. After leaving the stop sign, the plaintiff was confronted by a situation which put him in danger. In this situation he cannot be held to the standard of taking the best or most proper action under the circumstances. The plaintiff had no real options. As the trial court stated, plaintiff perhaps could have accelerated to his right into the grass median which was a ditch. As another alternative, he could have gone forward and hit the Scott vehicle which might have occasioned less severe injuries if that maneuver would have taken him out of the southbound lane. As stated in Bialy v. State, Department of Transportation and Development, 414 So.2d 1273 (La.App. 3rd Cir.1982) at page 1278:
"One who suddenly finds himself in position of imminent peril, without sufficient time to consider and weigh all circumstances or find the best means to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself was brought about by his own negligence. This "doctrine of sudden emergency" is appropriate in the consideration of fault as it bears upon contributory negligence as well. Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385 (La.1972)."
The trial court correctly found plaintiff was not guilty of any contributory negligence.

Negligence of the State.
Defendant-appellant first contends that if the Scott vehicle did block plaintiff's vehicle, the suggested improvement of placing dividers for guidance in the area where the Scott vehicle angled out toward Mr. Copeland would not have necessarily kept the Scott vehicle from proceeding incorrectly. This is essentially a cause-in-fact argument. The cause-in-fact test analysis is satisfied if the actions complained of were a substantial factor and contributed to the incident which caused plaintiff's injuries. Dixie Drive-it Yourself System v. American Beverage Company, 242 La. 471,137 So.2d 298 (La.1962), Straley v. Calongne Drayage and Storage, Inc., 346 So.2d 171 (La.1977), Kalmn, Inc. v. Empiregas Corp., 406 So.2d 276 (La.App. 3d Cir. 1981), Ishee v. State, Department of Transportation & Development, 413 So.2d 1362 (La.App. 1st Cir.1982), Tyson v. American Indemnity Co., 411 So.2d 498 (La.App. 1st Cir.1982), writ denied, 413 So.2d 505 (La. 1982). Plaintiff has satisfied this test.
The evidence was overwhelming that the State, which conceded it had ownership and control of the intersection, had determined several years previously that the intersection in question was a dangerous one, and the State had been aware of the danger for some time. Among plans for making the intersection less hazardous were plans for channelization of traffic. Had channelization been effectuated prior to the time of the accident with which we are concerned in this case, it is safe to assume that it would have been less likely the Scott vehicle would cross into the wrong lane and trap plaintiff as he did. The negligence of the defendant need not be the only cause in fact of the injuries, but need merely be an substantial factor. Dixie Drive-it-Yourself, supra.
*1255 Defendant next contends that the State was not negligent in failing to effectuate its plans to make the intersection less hazardous. This involves a duty-risk type analysis. The question is whether or not the duty of the State to maintain roads and intersection is for the purpose of preventing the type of accident that in fact occurred. It is true that while the State has the responsibility for proper road maintenance, it is not an insurer of public safety on these roads. Mauthe v. Gibson, 367 So.2d 1280 (La.App. 3rd Cir.1979), writ ref., 369 So.2d 156 (La.1979). However, a duty-risk analysis allows for policy factors to enter into a court's decision as to the scope of the duty and the risk to be protected against. Defendant has failed to negative its responsibility for the accident that occurred.
As stated above, the evidence overwhelmingly establishes that the State knew of the hazard and failed to correct it. Lawrence Harry, District Traffic Operation Engineer for Highway District 3, testified that for a number of years the State planned to either close the intersection or to alter it, using channelization controls and possibly other methods of reducing the hazard. For several years prior to the accident correction of hazards at the intersection was number one on the State's list with respect to the total benefit to be obtained for the least number of dollars spent on highway safety. The governing body of the City of Lafayette passed a resolution requesting that the Department either channelize the median area or close the median area. Mr. Harry testified that he felt that one of the options should have been exercised. Mr. Harry testified that the incidence of the type of accident Mr. Copeland was involved in would be reduced if the State had taken the action that its own department recommended and that the City of Lafayette requested.
We find that the trial court was correct in finding that the State breached its duty to protect against the precise risk of injury that occurred and in finding that the defendant was not contributorily negligent.
Plaintiff has also urged Article 2317 of the Louisiana Civil Code as a basis for liability. Inasmuch as the trial court bases its judgment on negligence, and we affirm the judgment, we do not reach the question of defendant's liability under Article 2317.

II. DAMAGES
No citation of authority is required for the well established principle that the function of an appellate court in reviewing a damage award is not to decide what it considers an appropriate award on the basis of the evidence, but rather to review the exercise of discretion by the trier of fact. Appellate review of awards of damages is limited to determining whether the trial court abused its much discretion.
The trial court awarded damages in the total amount of $653,197.37 plus court costs and expert witness fees. Of this amount, $150,000 represents general damages and $500,000 represents lost pre-trial wages and future lost wages.
As for general damages, the trial court has not abused its "much discretion". In comprehensively written reasons for its ruling on the damages issue, the trial court shows that its award is clearly based on the evidence. At the time of the accident Jack Copeland was 29 years old and had recently graduated from college with an excellent grade point average. Approximately one year before the accident, he had gone to work for the A.H. Gardes and Company, a public accounting firm in Houston, Texas. As a result of the accident, Copeland has been forced to change such work to less stressful work. Among other reasons the reason for the change is to decrease the likelihood of epileptic seizures, one of which plaintiff experienced directly after the accident. A further reason for the change was the opinion of himself and a consensus of opinions held by his former co-workers and superiors that he could not perform the functions he would be asked to perform at A.H. Gardes in the manner he had proven *1256 he was capable of prior to the accident. As a result of the diminution in his ability to compete and advance in the company, Copeland has suffered from frustration, depression and mental anxiety. A psychiatrist, Dr. William Cloud, testified that Copeland has overriding emotional problems in terms of accepting the adjustment he must make to his lessened ability to function. Mr. Copeland has exhibited significant depressive symptoms as a result of the accident.
The physicians who examined Mr. Copeland directly after the accident stated that Mr. Copeland had a significant closed head injury or a moderately severe closed head injury. The psychiatrist testified that Mr. Copeland had brain damage as a result of the trauma. Mr. Copeland was not aware of his surroundings for four days after the accident and for some time thereafter he remained somewhat disoriented. Mr. Copeland suffered dizzy spells for approximately one year following the accident and he had a loss of memory and depression. Mr. Copeland lived with his mother for approximately a year after the accident and his social life decreased in quality. He slept a great deal on the weekends, the year after the accident, and his mother testified that as a result of the accident he has remained unhappy, frustrated, and angry. Before the accident Mr. Copeland was motivated and ambitious. He now feels that his ability to achieve the goals he set in life has been significantly impaired and he fears he will never accomplish his goal of passing the CPA exam.
As a result of the possibility of epileptic seizures Mr. Copeland cannot swim alone, climb, engage in contact sports, or put himself in stressful situations. The psychiatrist did psychological testing on Mr. Copeland which indicated that his brain injury had reduced his ability on the side of his brain which handles performance skills to an IQ rating of 95, which puts him at the low average area of intellect. However, Mr. Copeland's verbal skills remain at an IQ of 122. The psychiatrist testified that he did not believe Mr. Copeland's present condition of impaired ability will improve in the future.
Based on these and other considerations, we believe the trial court's award of $150,000 in general damages was justified.
Defendant argues that the $500,000 awarded for past and future lost wages is speculative and excessive. In making its award the trial court evidently gave weight to the estimates of Dr. George Randolph Rice, chairman of the Economics Department at Louisiana State University. Although Dr. Rice's estimate of total lost wages was a maximum of $747,320 (which included bonuses) and a minimum of $668,798 (which excluded bonuses) the trial court awarded only $500,000 to the plaintiff for lost wages. The trial court explained the decision to award an amount lower than the estimates as being a result of the willingness plaintiff indicated to minimize the effect of his injuries and the trial court's conviction that Mr. Copeland will find some solution to compensate for the brain damage he has suffered, with an attendant decrease in his future economic losses. Plaintiff has not appealed from any part of the trial court's judgment.
The calculations that indicate plaintiff's past or pre-trial wage losses include the difference between what Mr. Copeland earned after he left his position with A.H. Gardes and Company up to the time of the trial date and what he would have earned had he not changed his job, including a 25% raise for the year and month time period before the trial. These raises were actually given to new CPA's by plaintiff's former employer. The calculations also assume that Mr. Copeland would have passed his CPA exam before the time he actually left the Houston firm.
Dr. Rice testified that approximately eighty per cent of the applicants for the CPA certification pass by the third attempt. Dr. Rice based this conclusion on conversations he had with other LSU faculty members and accounting professors. Mr. Copeland *1257 probably would have taken the exam for the third time in May, 1981, one month before he actually left his employment with A.H. Gardes and Company. Johnny Price, a senior partner with A.H. Gardes, testified that interviewees are hired with the expectation that they will become CPA's and that Mr. Copeland would not have been hired unless they were certain he could eventually pass the exam. The evidence indicates Mr. Copeland had the motivation, education, and ability to pass the exam before the accident.
The lost pre-trial wages of $12,451 have been proved to a reasonable certainty and are affirmed.
Dr. Rice made projections of future loss of income. His detailed report is in evidence and appears at pages 162 through 165 of the record. A fellow faculty member who assisted Dr. Rice validated their conclusions and projections through consultations with executives of the "Big Eight" accounting firms. The projection presented by Dr. Rice assumes factors based on continued employment of plaintiff and his probable progress had he not experienced his injuries.
The projection assumes that for the first three years after the date of trial the plaintiff would have received annual raises or increases in salary of 22.5% of the base income at the time of trial. This assumption was made because it conformed to the established policy of A.H. Gardes and Company.
Beginning with the fourth year after the date of trial, and continuing through the remainder of plaintiff's work life expectancy (32.9 years), Dr. Rice projected a ten per cent annual increase in salary. This ten per cent figure is an average figure which takes into account fluctuations and variations which will necessarily occur over a period of years.
Dr. Rice made two projections, one without inclusion of bonuses and one assuming annual bonuses of six per cent. Both projections were based on calculations which showed that, with the expected raises described above, plaintiff's total earnings for the rest of his work life would have amounted to $1,308,703. Plaintiff's actual projected earnings were $639,905. By subtracting the two figures Dr. Rice arrived at a future loss of income without bonuses of $668,798.00. By adding bonuses the figure comes to $747,320.
The trial court made an award of $500,000 "for economic loss, past, present and future". Considering the testimony of the expert economist and the trial court's own assessment of abilities and attitude of the plaintiff, the award does not appear to represent an abuse of the trial court's discretion.

DECREE
For the reasons assigned, the judgment of the trial court is affirmed. The costs of this appeal are assessed to the appellant.
AFFIRMED.
*1258